### THE STATE v. J. C. PARISH.

*Rape—Evidence—Indictment—Joinder of Counts— When Prose-*
*cutor Required to Elect.*

1. Where there was testimony tending to show that a prisoner charged
   with rape had had carnal intercourse, forcibly and against her
   will, with his daughter, a girl about twelve years old, at various
   times, for nearly two years prior to the finding of the indictment:
   *Held*, that it was not error to refuse to compel the prosecution to
   elect between the different transactions till the close of the evi-
   dence on behalf of the State.

2. Where there are several counts, each covering separate transactions,
   punishable in the same way, or only one count, but testimony as
   to two or more transactions falling under the charge, the Judge
   may, in his discretion, refuse or allow a motion to force the prose-
   cutor to elect, and may determine the time when the election is to
   be made, if at all.

3. In the exercise of this discretionary power, the Courts have generally held that the prosecutor (especially on the trial of felonies or offences punishable with infamous punishment) should be compelled to elect at the close of the testimony for the State, except in cases where the evidence of each one of the transactions is so mixed with and dependent on the testimony as to the others, with their attendant circumstances, that the Court does not deem it practicable to confine the prosecutor to one transaction without destroying what seems to be a *prima facie case* of guilt against the defendant.

4. It has never been deemed so important to enforce an election on the part of the prosecuting officer on the trial of misdemeanors, punishable at the discretion of the Court.

5. Where there are several counts in an indictment, drawn merely to meet the different phases of the facts that will probably be proven, the Judge will neither quash nor require an election.

6. After the prosecutrix had been impeached by cross-examination, it was competent to prove by her brother that the prisoner took her out of bed when she was sleeping with witness, at a time when she had testified that her father ravished her, and that he heard what she told their mother on that occasion to corroborate her, and, also, that his mother ordered that the prosecutrix be removed to another bed, as a part of the *res gestæ.*

7. Evidence that the prisoner and his wife lived amicably together after such intercourse with the daughter did not tend to contradict the prosecutrix, and was incompetent.

8. After the prosecuting officer had elected to rely upon a particular transaction, when prosecutrix testified that prisoner penetrated her person, it was not error to instruct the jury that they could not find the prisoner guilty of an assault with intent to commit rape (under ch. 68, Laws of 1885), though the testimony as to another transaction tended to prove only that offence.

This was an Indictment for Rape, tried at January Term, 1889, of the Superior Court of WAKE County, before *Graves, J.*

The indictment was drawn for the common law offence.

C. E. Goodwin, of the regular *venire,* was challenged by the State, for that he had a suit pending and at issue in this Court, and it being found as a fact that he was a party to an action pending and at issue, the cause was allowed and the prisoner excepted.

The State introduced Esther Parish, daughter of the defendant, who testified that she was about eleven years old; that the prisoner would meet her and carry her down in the old field "and put his private parts to mine. He would do this so often that I can't remember how often. The first time was in the field. I think it was more than a year ago. I ran; he caught me; I screamed; he took me to a ditch. I was scared so bad, and it has been so long ago, I can't say whether I was hurt."

The witness further testified that, "one morning after that, he (the prisoner) went to the field without his breakfast, and I carried it to him, with some water. He said, 'I will have to pay you for this.' He took hold of me, put me down and put his privates to mine. His privates entered mine and made me sore."

The State now offered to show an alleged rape at another time. The prisoner objected. The Court ruled that the State was not confined to any particular time, but might introduce evidence tending to show other acts—tending to show that the prisoner had committed the act charged at other times—further saying that at the close of the State's testimony the Solicitor would be compelled to elect which particular act he would rely upon.

The objection was overruled and the prisoner excepted.

The witness testified that at various other times and places the prisoner had violated her person: "I remember one time when he was plowing in the new ground. I went to carry him some water; he threw me over the fence and put his privates in mine. I went to the house and told my mother; she went down there and said something; she said he would have to stop this. Julia Jones was at the house, scouring. When my mother called him to dinner he was a long time coming; when he came he brought a long switch, and said he intended to make his children mind him.

Julia Jones was scouring the piazza; he did not say anything to her."

The prisoner objected to any evidence tending to show any offence committed at any time other than that laid in the bill of indictment.

The objection was overruled, and the prisoner excepted.

The witness then stated that at another time the prisoner took her from her bed to his bed and had connection with her; that, at that time, the prisoner slept in a little room where there were two beds, and that the mother of witness and one Florence Stanly occupied another room in which was but one bed; that when her father took her from her bed her brother waked her mother and told her; that thereupon her mother told Florence Stanly to take the witness in bed with her, which was done.

Upon cross-examination, the witness, in answer to question how frequently this occurred, said, "Every week."

The witness also stated that she never at any time consented to these acts of carnal intercourse with her father, the defendant.

Joe Parish, brother of the witness Esther, was introduced by the State to corroborate the statement made by Esther that her father had taken her from the bed where she was sleeping, and proposed to show the details of the statement made by the witness Esther to her mother in the hearing of this witness. The prisoner objected, upon the ground that it was incompetent for the State to prove details of conversations overheard by witness between Esther and her mother regarding her father's treatment of her not testified to by Esther; and also on the ground that a wife's evidence is not competent against her husband, except in case of assault upon the wife by the husband, and the State could not do by indirection that which the law expressly prohibited it from doing directly; and also, because the State cannot show, for the same purpose, details of other offences

of like nature to that charged in the bill of indictment, and said to have been committed by the prisoner.

The Court being of the opinion that the witness Esther had been cross-examined with a view to impeach her credibility, overruled the objection, admitted the testimony, and prisoner excepted.

Joseph P. Gulley, brother of defendant's wife, was a witness for the State. Upon cross-examination, the prisoner proposed to show by this witness that his wife and himself lived amicably and peaceably, with the view of contradicting Esther and Joe Parish.

The State objected. Objection sustained. The prisoner excepted.

Julia Jones was introduced by the State to corroborate Esther Parish.

Defendant objected, because witness Esther had testified that on that occasion he did not ravish her.

It was insisted by the Solicitor that, under the bill of indictment, it was competent to prove an assault with intent to ravish, because, in an indictment for rape, the jury might find the prisoner guilty of the main charge of rape, or of the minor felony of assault with intent to ravish, or even of a simple assault and battery.

The objection was overruled, and the prisoner excepted.

The witness then proceeded to state that, on the second Saturday in September, 1888, the wife of the prisoner had gone to church; he called Esther to bring him a needle and thread, when he was dressing for church, in the big house. She did not want to go, but witness made her go; that when Esther got to the door the prisoner jerked her in by the arm and choked her. She said he choked her, but did not say why he did it. "In August I was there; Esther came to the house crying. She went to carry prisoner water where he was plowing in the cotton; told her mother he put her over the fence, laid her down and did what he wanted to;

said he hurt her so bad she could hardly walk. She told her mother, who went down to the field."

The prisoner objected, upon the ground taken in a previous objection, that the State could not remove the veil which the law throws over the domestic relations of man and wife, and show indirectly, out of the mouth of another, that which it was prohibited from showing directly by putting the wife on the stand as a witness in the cause.

The objection was overruled, and the prisoner excepted.

Pending the examination of medical experts, who were necessarily absent from the Court, the State rested its case, and by consent the experts were examined later, and the State elected to rely on the one act, when the witness Esther said the prisoner threw her over the fence in the summer time when he was plowing. The prisoner requested the Court to rule out all evidence except that bearing on the particular act relied on by the State. The request was refused, and the prisoner excepted.

The prisoner introduced testimony tending to contradict the evidence offered by the State

Dr. Sexton, who was admitted to be a medical expert, testified for the State: " I examined the parts of Esther Parish about the time of the trial before the Justice of the Peace. I found the hymen ruptured ; parts very sore; some bruises about the labia minora; the hymen was ruptured almost entirely. It seemed to have been recent, from the appearance of inflammation. Rupture of hymen is recognized as evidence of deflowering. The appearance of the parts was such as would most usually follow partial penetration. I examined her to-day; the parts are at present inflamed ; the points are gone; the inflammation was acute; it is now sub-acute."

*Cross-examined.*—" There are other causes that will rupture the hymen ; local disease may; I do not know that violent exercise in a child would rupture; I can't say that the

appearance was from a bruise. I could not say that it was not produced by leucorrhœa; the rupture of hymen does not necessarily show intercourse; the hymen in this case was torn, not perforated by little holes; it was as if something had been pushed through; I can't say that it was a man's parts (not dilated); the member of a male could have been pushed in to rupture the hymen; the parts did not have the appearance of frequent penetration; I do not think it could have been that penetration had been made to reach the hymen two years; inflammation of parts and discharge is not an unusual thing in girls of this age; there is now sub-acute inflammation, which does not come from leucorrhœa, because it has pus in it; I cannot tell the cause of the inflammation; leucorrhœa is not produced by inflammation; it is a discharge from the vagina; it has no pus in it."

Dr. Ellis, for the prisoner, admitted to be an expert, testified: "I have examined parts of witness. The appearance of the discharge with pus—the present discharge—does not necessarily show that it comes from violence, as distinguished from what we would call natural causes. The long-continued reception of the organ of a man for two years—I do not think her parts would tolerate a male organ—that is, complete penetration, kept up for two years, with appearance of her parts—diagnoses of leucorrhœa. There have been many causes—anything that sets up irritation that does not amount to inflammation. I do not think she looks as if a man had penetrated twice or three times a week for two years."

*Cross-examined.*—"I mean penetration to the vagina. There may be such a thing as a mere vulvular connection. The appearance of the parts might be as they now appear. At her age, I could not say, from the appearance, that there has not been vulvular penetration for twenty times. The discharge does not show what I call pus; it does not show a glutening, showing chronic."

In his charge to the jury, the presiding Judge said: "The State, having been directed by the Court, selected the one act on which the Solicitor relies, so as to give the prisoner the chance to defend as to that, and the Solicitor selects the time he has relied on. The evidence is to be considered with this specific charge. The jury will then strike out from their minds the allegation of the other acts of the prisoner. It is not allowed to show that prisoner has been guilty of other acts of like kind to show that prisoner is guilty of this. Such evidence coming in has been used by both the prosecution and counsel for prisoner upon the credibility of witnesses."

There was a verdict of "guilty," and thereupon the defendant moved the Court for a new trial, which motion was refused. Defendant excepted, and moved the Court for a *venire de novo* upon the ground that his Honor erred in charging the jury that there was no evidence that would warrant them in finding the defendant guilty of an assault with intent to commit rape, under the bill of indictment in this cause; and that the counsel for the State relied upon the evidence introduced by the State to show either the commission of the rape and felony charged in the bill, or an assault with intent to commit rape, up to the time the State elected to stand or fall upon the particular act of rape, as testified to by the witness.

There was a motion in arrest of judgment. Motion denied, and exception by the prisoner. Sentence of death pronounced, from which the prisoner appealed.

*Attorney General*, for the State.
*Mr. T. P. Devereux*, for the defendant.

AVERY, J.—after stating the facts: The first exception was not insisted on by counsel, but was not abandoned. It being found as a fact that the juror Goodwin was a party to an

action pending and at issue in the Court in which the prisoner was being tried, it is only necessary to refer to the plain language of the law (*The Code*, § 1728), without citation of the cases construing it.

The prisoner objected to allowing the prosecutrix, Esther, to testify as to different occasions, extending over a period of more than a year, in which he, as she alleged, had had carnal intercourse with her against her will, and this is the ground upon which are based the second and third exceptions.

When the point was first presented by counsel, the Judge announced that he would allow the State to introduce evidence tending to show the commission of the offence charged at different times; but would compel the Solicitor, at the close of the State's evidence, to elect and state which particular act he would rely upon.

While the practice of requiring the prosecution to elect, in some instances, between the different counts of a bill of indictment, or between distinct transactions, each constituting the offence charged in a particular count, prevails both in England and in the different States of this country, the weight of authority has established, generally, the rule that it rests in the sound discretion of the *nisi prius* Judge to determine whether he will compel an election at all, and if so, at what stage of the trial. 1 Bishop's Crim. Pro. Sec., 205; *ibid.*, §§ 6 to 9; 1 Roscoe on Cr. Ev., marg., p. 207; 1 Wharton's Crim. Law, § 423; *State* v. *Woodard*, 21 Mo., 265; 3 Hill's Reports, 159; *State* v. *Haney*, 2 Dev. & Bat., 390.

The general rule, too, is that the appellate Courts, except in those States, where matters of judicial discretion are held subject to review, do not interfere with the discretion of the inferior tribunal in allowing or overruling motions to put the prosecutor to his election. Bish. Crim. Pro. Sec., 205; Wharton's Crim. Law, 423. In the exercise of their

legal discretion judges have been sustained in fixing the time of election at the close of the evidence on both sides; the reason for putting a prosecutor to his election being that the prisoner may not have his attention divided between two or more charges. The better rule for the exercise of this discretion is, that the election ought to be made, not merely before the case goes to the jury, as it is sometimes laid down, but before the prisoner is called on for his defence at the latest. Roscoe Cr. Ev., marg., p. 208; Bishop's Cr. Pro., § 215; *State* v. *Smith*, 22 Vermont, 74. It is true that a different rule was adopted in Michigan, and in the interpretation of one particular statute in Alabama. But the Courts of those States stood almost alone in so limiting the sound discretion of the trial Judge, and especially in driving the prosecution to an election before any evidence is heard, or at an early stage in its development. *State* v. *Czanikow*, 20 Ark., 160; *Kane* v. *People*, 8 Wend., 203; *State* v. *Slye*, 26 Me., 212; *State* v. *Haney*, 2 Dev. & Bat., 390; *State.* v. *Reel*, 80 N. C., 442.

There has been less controversy about the exercise of the legal discretion where testimony as to various transactions, each one constituting, if the evidence is believed, a misdemeanor, has been heard. In such cases nearly all the Courts conceded the right of the presiding Judge in his discretion to refuse to drive the prosecution to the election at all, but some go so far as to doubt the power of the Court to compel an election. 1 Bish. Crim. Pro., § 209; *Kane* v. *People, supra.*

This Court has repeatedly held that the presiding Judge might, in his discretion, hear the evidence on a number of counts in a single indictment charging felony, or "on a number of distinct bills, treating each as a count of the same bill," and refuse to require the Solicitor to elect till the close of the evidence for the State. *State* v. *Hastings,*

86 N. C., 596; *State* v. *Dixon*, 78 N. C., 558; *State* v. *Watts*, 82 N. C., 656; *State* v. *Haney, supra,* and *State* v. *Reel, supra.*

In *State* v. *McNeill*, 93 N C., 552, Justice MERRIMON, delivering the opinion, says: "So that *distinct felonies of the same nature* may be charged in *different* counts in the same indictment, and two indictments for the same offence may be treated as one containing different counts, subject to the right of the defendant to *move to quash*, in case of *inconsistent* counts, and the *power of the Court* to require the prosecuting officer to elect the count or indictment on which he will insist. This certainly may be done, and we can see no substantial reason why the same rule of practice may not apply to several indictments against the same parties for like offences, when the just administration of criminal justice will thereby be subserved." In *State* v. *Haney, supra,* Judge GASTON says: "It is, however, in the discretion of the Court to quash an indictment or compel the prosecutor to elect on which count he will proceed, when the counts charge offences actually distinct and separate."

In *State* v. *Morrison*, 85 N. C., 561, Justice RUFFIN, for the Court, says: "The common law rule is, that if an indictment contains charges distinct in themselves and growing out of separate transactions, the prosecutor may be made to elect, or the Court may quash. But where it appears that the several counts relate to one transaction, varied simply to meet the probable proof, the Court will neither quash nor force an election." This was said in reference to a case in which there was a count for larceny and one for receiving. The leading text-writers who are generally recognized as authority, as will appear from the references *supra* to Roscoe, Bishop and Wharton, concur in holding that the same rule applies where there is but one count and testimony as to several transactions, either of which will be relied on to make a case under that count, and where there are several

104—44

counts containing distinct charges and growing out of separate transactions, all punishable in the same way.

It is conceded to have been the general, but not the mandatory practice of the Courts to compel an election at the close of the evidence, as his Honor did in this case. But the proposition that the Judge, in instructing the jury, should tell them to attempt to discard from their minds all of the testimony touching any transaction except that which was located at the fence and was relied on by the prosecutor for conviction after the election was enforced, is a novel one, the adoption of which in practice would lead to perplexity and confusion, and if the jury could carry out the instruction, would of necessity withdraw from their consideration evidence very important in reaching a verdict. To illustrate this view of the subject we need not go beyond this case. It is material to show that Esther did not consent when the prisoner had intercourse with her at the fence (if the jury find that he did), and any outcry she may have made, and any declarations by her as to that transaction, would of course be material. If the jury would otherwise have been in doubt as to whether she was willing on that particular occasion, because she did not make an alarm or offer stubborn resistance, would it not be material to know that the prisoner, being her father, had repeatedly forced her to submit prior to that time, and that on one of these occasions she was heard to cry at night? Would not any juror, from his observation and knowledge of human nature, be prepared to believe that she did not consent, upon less proof of outward manifestation of opposition before, or of grief after he accomplished his purpose, if he believed the further fact that she had been forced repeatedly, and even in the presence of her mother, to submit to the same terrible ordeal, and no person had been able to prevent it? Might she not have offered less resistance or remonstrance, because she despaired of help and submitted unwillingly to the author-

ity of a father upon whom no influence seemed to impose any restraint. *State* v. *Cone*, 1 Jones, 18.

Bishop, in his work on Criminal Procedure, says: "Where several felonies are so mixed that they cannot be separated, evidence of the whole may be given." Evidently the author had in his mind some such case as this, and the rule laid down by him suggests the question whether his Honor might not have best subserved the ends of justice by refusing to enforce an election at all in this case. The Judge who presides at the trial of such cases is clothed with the power to grant a new trial, if upon a review of all of the evidence he has reason to believe that the prisoner has been taken at disadvantage because he was left in doubt about the specific charge that he was to answer. In fact, we apprehend that, in practice, a defendant is not often surprised by the development of evidence as to two or more such similar transactions; and if he is, the salutary corrective is found in the unlimited discretion of the Court to set aside a verdict. If the State had only offered evidence as to the alleged violation of Esther's person when the prisoner put her over the fence, it would have been unquestionably competent for the prisoner, on her cross-examination, or by other witnesses, to have shown that he had carnal intercourse with her at other times, as bearing upon the question of force. *State* v. *Jefferson*, 6 Ired., 305. It would be unreasonable to deny to the State the right to show repeated acts, and that all were committed against her will, in order to explain her conduct on the particular occasion to which the attention of the jury is directed, and to throw light upon the question whether she yielded willingly to his embraces at that time. So far as our investigations have extended, it does not appear that it has ever been contended that, after election in favor of one of several transactions falling under the same charge is enforced, the jury should attempt the difficult, if not impossible, task of ignoring other evidence so intimately

interwoven with the transaction relie i on that an attempt to separate testimony of the other similar acts, with their attendant circumstances, must destroy the whole web in which the prisoner may have been involved by the testimony for the State. It has been settled, however, that the fact that a person has committed one crime shall not be admitted before, or considered by, a jury as tending to raise a presumption that he has committed another offence. In compliance with this principle the jury were told, in effect, not to consider evidence of the commission of a like crime at any other time as tending to prove the commission of the rape as charged when the prisoner lifted Esther over the fence. The rule is that testimony as to other similar offences may be admissible as evidence to establish a particular charge, where the intent is of the essence of the offence, and such testimony tends to show the intent or guilty knowledge. *State* v. *Murphy*, 84 N. C., 742.

We conclude, therefore, as to the second, third and eighth exceptions, there was no error, because—

1. Where there are several counts, each covering separate transactions punishable in the same way, or only one count but testimony as to two or more transactions falling under the charge, the Judge may, in his discretion, refuse or allow a motion to force the prosecutor to elect, and may determine the time when the election is to be made, if at all.

2. In the exercise of this discretionary power, the Courts have generally held that the prosecutor (especially on the trial of felonies or offences punishable with infamous punishment) should be compelled to elect at the close of the testimony for the State, except in cases where the evidence of each one of the transactions is so intertwined with and dependent upon the testimony of the others, with attendant circumstances, that the Court does not deem it practicable to confine the prosecutor to one transaction without destroy-

ing what seems to be a *prima facie* case of guilt against the defendant.

3. It has never been deemed so important to enforce an election on the part of the prosecuting officer on the trial of misdemeanors punishable at the discretion of the Court.

4. Where there are several counts in an indictment drawn merely to meet the different phases of the facts that will probably be proven, the Judge will neither quash nor require an election.

The prosecutrix Esther had been impeached on her cross-examination, and when the State offered to corroborate her by the testimony of Joe Parish, as to the fact that she cried when taken out of bed by the prisoner, and to prove that he heard what she told their mother on that occasion, and afterwards heard Esther tell her what was done when her father put her over the fence, the prisoner objected, on the ground that it was not competent to introduce, in that indirect way, the declarations of the wife made in the conversation, when she was not competent or compellable to testify against her husband.   The test of the validity of such objections is properly made by examining the testimony admitted, not simply the objections stated.   We find that, in fact, the witness mentioned no declaration of his mother, except the order to remove Esther to another bed, and that was a part of the *res gestæ* of the transaction in the house, heard before the Solicitor made his election.   Esther had been impeached on cross-examination, and it was unquestionably competent to corroborate her by proving former declarations consistent with her evidence.   *State* v. *Laxton*, 78 N. C., 564; Best on Evidence, 570, note D.

Evidence that the prisoner and his wife lived amicably and peaceably would not tend to contradict Esther, or to prove the guilt or innocence of the prisoner, and therefore the objection to the testimony of Joseph P. Gulley was properly sustained.   *State* v. *Jefferson*, 6 Ired., 305.

If the prisoner had not forced the prosecuting officer to elect, there would have been testimony tending to show an assault upon Esther by the prisoner, and an unsuccessful attempt to commit a rape; but there was no evidence of an attempt to commit a rape when Esther was put over the fence. On that occasion, if the jury believed her, the purpose of the .prisoner was accomplished. It was not error, therefore, to refuse to instruct the jury, on the evidence, that they might find the prisoner guilty of an assault with an intent to commit rape.

It was within the peculiar province of the jury, upon this story of unnatural and almost incredible brutality, to determine whether the prisoner was guilty. We can only review the errors of the Court below, and we fail to find any erroneous ruling. Evidences of such unusual occurrences between father and child, extending over so long a period of time, should have been dispassionately considered, as we must suppose it was, before the jury returned their verdict.

There is no error.

Affirmed.