The facts are sufficiently stated in the opinion of the Court by Mr.Justice Walker.
The defendant Davenport and seventeen others were indicted and convicted, in the court below, of forcible trespass in tearing down three shacks, which had been erected in a lumber or logging camp, *Page 483 
and which were each about 10 feet long and 7 feet wide, made of poles and covered with tar paper, and had been built upon the land two or three days before the alleged trespass. The defendants have appealed to this Court and now allege that the learned judge who presided at the trial committed thirty-four errors in his several rulings during the hearing of the cause. The case had its origin in a dispute between the Roper Lumber Company and the Richmond Cedar Works over the title to a certain tract of land lying in that portion of the Dismal Swamp known as the Allen Swamp, which has as its northern boundary the dividing line between this State and Virginia, along which there is a canal running east and west with the said line. A careful perusal of the evidence taken in the case convinces us that the prosecutor, representing the Roper Lumber Company, and the defendants, representing the Richmond Cedar Works, were, at the time of the alleged trespass, vying with each other in an effort to gain the actual possession of the premises, in order to gain some advantage in defending the title to the land. The Roper Lumber Company, by its servants and agents, had actual possession of the land known as Allen Swamp, at the place where the huts had been constructed. The defendants, representing the Richmond Cedar Works, entered upon this part of Allen Swamp while the prosecutor was in actual and peaceable possession thereof, and ordered its servants and agents, who were then in charge of the same, to quit the premises. There were about forty members of the invading force, some of whom carried axes and others guns, and when (599) compliance with their demand was refused, they proceeded to demolish the huts and then to burn them. There was no physical resistance made by those in actual possession of the locus in quo, who held the possession until the cabins began to fall and then abandoned the premises to the defendants.
An extract from the testimony of the principal defendant, T. S. Davenport, will suffice to show the essential facts of the case upon which our conclusion as to the law will be based:
"Ours (Camps) were built eight days before the Roper Company's. The camps of the Richmond Cedar Works had been occupied all the time during those eight days and all full of men. I think there was close between thirty and forty men who had stayed in those camps in the Allen Swamp — the camps of the Richmond Cedar Works. These camps were all close as a half a mile to the ones the Roper Company put up. When I found they were there, I took my men and went there. First went to Hawks' camp and said, `Hawks, I have come here to take possession of this camp; the Richmond Cedar Works sent me here to hold possession of these woods, and I am going to take possession of this camp and cut it down and burn it.' He says, `My things are all in *Page 484 
there,' and I said, `I will take care of the things; get them out'; and he and Sanders got them out. They came out of the camp and I cut the camp down and threw it on the fire. That was the end of that camp. Then I took my men and went out on down the ditch where they had just built three camps down there. That was on Wednesday. We went on to the Mathias camp. They were all standing outside of the camp, and I said, `Mr. Mathias, are you in charge of these woods now?' He said, `Yes.' I said, `I am going to take possession of the camps, cut them down and burn them up.' I told him my reason, that the Cedar Works sent me there to hold possession and I was going to do it. He is the only man I parted my lips to. I then told him I was going to cut the camps up. He said, `You may cut the others down, but you won't cut this one down.' I said, `This is the best looking camp; this is the one I am going to take first.' He says, `I'll be damned if you cut this one down.' I said, `Boys, fall in on this camp.' Before that he leaves his door and goes back in the camp, and as they had then (600) commenced to tear the roof up, he said, `Let me get my bed and things out, and then I will get out.' I said, `All right.' Then I said, `Boys, get in there and help him get his bed out and other things.' He had some peas on the fire, and I had the boys take those out, and I told them to take all out and take his bed and lay it out there somewhere and then go ahead and cut the camp down."
The contention of the defendant seems to be that they should have been allowed to show that they had constructive possession of the place where the trespass is alleged to have been committed, by reason of the fact that they were in actual occupation of the remainder of Allen Swamp; that the prosecutor, by its servants and agents, had unlawfully entered upon the land, which was the property of the Richmond Cedar Works, and had wrongfully withheld the same, and that when they demanded possession of the land they were merely asserting the right and title of the Richmond Cedar Works to the same, and had no unfriendly feeling toward the parties in possession and did not intend to injure them.
Before entering upon a discussion of the main question involved in the case, we will refer to one technical objection made during the course of the trial by the defendants. When the solicitor had read the three indictments, the defendants moved that he be required to elect upon which count in each of the bills he would rely. The court overruled this motion and held that it would not require the election until the evidence had been heard. The motion was not renewed at the close of the evidence. It appears that the solicitor abandoned all the charges except the one for forcible trespass, and did not prosecute for malicious injury to property, and the judge so stated in the charge to the jury. It *Page 485 
cannot be doubted now that the solicitor was not put to his election until the close of the evidence, or at least that the judge was not required to restrict the trial to any special count until he could intelligently do so by knowing what the evidence in the case would be. This was decided inS. v. Parish, 104 N.C. 679, where it was said: "This Court has repeatedly held that the presiding judge may, in his discretion, hear the evidence on a number of counts in (601) a single indictment charging felony, or `on a number of distinct bills, treating each as a count of the same bill,' and refuse to require the solicitor to elect till the close of the evidence for the State." It may well be doubted whether the solicitor could be required to elect in this case, as the charges all grew out of the same transaction. "The common law rule is, that if an indictment contains charges distinct in themselves and growing out of separate transactions, the prosecutor may be made to elect or the court may quash. But where it appears that the several counts relate to one transaction, varied simply to meet the probable proof, the court will neither quash nor force an election."S. v. Morrison, 85 N.C. 561. There was no error, therefore, in the ruling of the court upon the defendant's motion for an election by the solicitor.
The defendants proposed to prove how far the line of the land was from the State line, with a view of showing that the prosecutor's servants and agents had come from Virginia and squatted on the land, and had then avoided the service of process and a restraining order by crossing the line again into Virginia. They further proposed to introduce in evidence a map of the premises for the use of one of the witnesses in explaining his testimony. The witness stated that he did not require it for that purpose, as he was familiar with the land; and further, they offered deeds and other evidence for the purpose of showing the title to and possession of Allen Swamp outside of the locus in quo. All this evidence was excluded by the court, and, we think, properly. The facts intended to be established by the rejected evidence were not releavant [relevant] to the case. It could make no difference whether the Richmond Cedar Works owned the land or not, or whether they failed to obtain service upon the prosecutor in the suit brought for the possession of the land and for an injunction. The only question in the case is whether the prosecutor's servants and agents were in possession of the particular land on which the trespass was committed, and whether the defendants attempted to oust them forcibly and violently. Forcible trespass is a crime against the possession and not against the title. S. v. Fender, 125 N.C. 649. If the Richmond Cedar Works had a better title than the prosecutor to the premises, or a better right to the possession thereof, (602) it should have been asserted by due process of law, and not by a violation of the criminal law of the State. S. v. *Page 486 Hovis, 76 N.C. 117. The right or title to land cannot be vindicated with the bludgeon, but the party who claims the better title must, if it be denied or the actual possession of the land be refused, upon a lawful demand made for the same, resort to the peaceful methods and processes of the law for his redress and the recovery of his property. If, instead of pursuing this course, he elects to use violence, the law holds him criminally responsible for his act. S. v. Webster, 121 N.C. 586, where it is said: "As forcible trespass is essentially an offense against thepossession of another and does not depend upon the title, it is proper to exclude evidence of title in defendants on trial under an indictment for such offense."
The principle governing such cases is clearly expressed by Judge Gaston
in S. v. Bennett, 20 N.C. 170: "We perfectly agree with the judge that the guilt or innocence of the persons charged with respect to the offense described in the indictment did not depend upon the question whether Curry had the right to the property, or the right to its possession, but whether he had, in fact, the possession thereof at the time when that possession was charged to have been invaded with such lawless violence." It has ever been the definition of forcible trespass in this State that it is the high-handed invasion of the actual possession of another, he being present and forbidding the same, and the title is not in question. It is sufficient, to constitute the offense, that the act complained of be done in the presence of the owner or person in possession (presenti domino) and must involve a breach of the peace or tend thereto. There must have been something done at the time of the entry to put the prosecutor in fear or incite him to force, either to prevent the wrongs or to protect his title to the property. Whether the title is in the prosecutor or the defendant is of no moment in forcible trespass.
It is the invasion of the actual possession of another, and not his constructive possession, done in his presence and under such circumstances as endangers the public peace, that makes the offense. (603) This is stated to be the law by the younger Judge Ruffin (who displayed distinguished ability in this Court, and a man who was eminent in his profession and at the bar as a criminal lawyer) in the case of S. v. Laney, 87 N.C. 535, and it is sustained by numerous decisions of this Court. S. v. McCanless, 31 N.C. 375; S. v. Ross,49 N.C. 315; S. v. Woodward, 119 N.C. 838. In S. v. Covington,70 N.C. 71, Judge Bynum says that to constitute the offense of forcible trespass, there must be a demonstration of force, as with weapons or multitude of people, so as to make a breach of the peace or directly tend to it, or such as is calculated to intimidate or put in fear, citing S. v.Ray, 32 N.C. 39. *Page 487 
What is said by the present Chief Justice in S. v. Mills, 104 N.C. at p. 905, covers this case more fully, perhaps, than any other expression to be found in the cases. In substance, it is this: "The offense of forcible trespass consists in entering upon land in the actual possession of another, with a strong hand. There must either be actual violence used or such demonstration of force as is calculated to intimidate, or alarm, or involve, or tend to a breach of the peace. The use of force must be such as to create a reasonable apprehension in the mind of the adversary that he must yield to the demand made upon him in order to avoid a breach of the peace", citing S. v. Covington, supra; S.v. Pollok, 26 N.C. 305; S. v. Pearman, 61 N.C. 371; S. v. Lloyd,85 N.C. 573. We are not called upon in this case to say whether or not it is necessary that the demonstration of force accompanying the act of invasion should consist either in a multitude of people or in the display of weapons, in order to become such an entry with a strong hand as will constitute the offense. Whether the entry is sufficiently violent will depend, to some extent, upon the circumstances of each particular case. For example, in S. v. Hinson, 83 N.C. 640, the act of a man riding into the yard or curtilage of a house occupied only by a woman, after being forbidden so to do, and remaining there cursing here, was held by this Court to be such an act of force as was calculated to intimidate her or put her in fear, and therefore, sufficient to constitute forcible trespass. The essential element of the offense is that the conduct of the defendant must be such as (604) is calculated to intimidate the party in possession and to put him in fear, or to compel him, by threats of violence which are sufficient to overawe a man of ordinary firmness, to abandon or surrender his right to the possession, or to desist from the assertion of the same.
The learned counsel for the defendant, in the argument before us, urged that, at common law, if the party having the better right or title has lost his possession by the unlawful entry of another, he is entitled to regain it by the use of such force as is necessary for the purpose, provided it does not amount to an actual breach of the peace, where as one not having a lawful right of entry is guilty of trespass if he goes upon the land with a strong hand under circumstances calculated to excite terror, although the force used does not amount to a breach of the peace. This doctrine, if it ever had any real existence at the common law, and this is extremely doubtful when the authorities are carefully examined and considered, has long since been repudiated by the courts and abrogated by the statute. They rely upon what is said by Judge Pearson in S. v. Ross, 49 N.C. 315, but the force of this expression was greatly weakened, if not entirely destroyed, by the decision in S. v. Shepard, 82 N.C. 614, where it will be found that Chief Justice Smith strongly *Page 488 
intimates that the distinction thus made, if it ever existed, was swept away by our statutes. In 1 Hawkins Pleas of the Crown, ch. 28, at p. 495, we find the law thus stated: "It seems that, at common law, a man disseized of any land (if he could not prevail by fair means) might lawfully regain the possession thereof by force. But this indulgence of the common law, in suffering persons to regain the lands they were unlawfully deprived of, having been found by experience to be very prejudicial to the public peace, it was thought necessary, by many severe laws, to restrain all persons from the use of such violent methods of doing themselves justice." Blackstone, whose book on the criminal law is of the highest authority, follows Hawkins, and in his fourth volume, at p. 148, says: "An eighth offense against the public peace is that of a forcible entry and detainer, which is committed by violently taking or keeping possession of lands with menace, force, and arms, and (605) without the authority of law. This was formerly allowable to every person disseized or turned out of possession, unless his entry was taken away or barred. But this being found very prejudicial to the public peace, it was thought necessary, by several statutes, to restrain all persons from the use of such violent methods, even of doing themselves justice, and much more if they had no justice in their claim."
In King v. Wilson, 8 Term, 357, Lord Kenyon said that perhaps some doubt may hereafter arise respecting the statement of Mr. Sergeant Hawkins that "at common law the party may enter with force into that to which he has a legal title," and the Court of King's Bench reversed its own opinion as to the correctness of this proposition. But however that may be, it is very sure that the law has been changed by statute, both in England and in this country, so that now it is plain and unmistakable. This statute is the one referred to by both Hawkins and Blackstone. It was enacted in the fifth year of the reign of Richard II., and is known as chapter 7 in the compilation of the laws of England for that period, and is as follows: "And also the King defendeth, That none from henceforth may make any entry into any lands and tenements but in case where entry is given by law; and in such case not with strong hand, nor with multitude of people, but only in peaceable and easy manner. And if any man from henceforth do to the contrary, and thereof be duly convict, he shall be punished by imprisonment of his body and thereof ransomed at the king's will." This statute was substantially adopted in this State, and I will be found in the following revisions: Revised Code, ch. 49, sec. 1; Code, sec. 1028; Pell's Revisal, sec. 3670. Mr. Pell has appended a note to the section, containing a full collection of all the cases decided by this Court upon the subject, and with reference thereto it is conclusively and uniformly held that whatever may have been the common law in regard to this matter, it is now unlawful, *Page 489 
even where the party is the real owner of the land, to enter thereon with strong hand or with multitude of people, when the law authorizes them to enter only in a peaceable and easy manner; and he who enters otherwise, or with strong hand, is guilty of a misdemeanor. (606)
The case of S. v. Pollok, 26 N.C. 305, is a decisive one against the defendants. The only difference between the two cases is that the show of force in Pollok's case was much less formidable and impressive than it was shown to be in this case. Judge Daniel there said it was unnecessary that the prosecutor's possession was held under title if, at the very time of the forcible entry, it was peaceably held and enjoyed by him, and that personal violence is not an essential ingredient of the offense; but if there is such a show of force as to create a reasonable apprehension in the mind of the party in actual possession that he must yield to avoid a breach of the peace, and he does yield, it would be a surrender upon compulsion or force and such as would make it a forcible trespass at common law. Proceeding, he said: "The defendant contended that the offense was not complete until some actual breach of the peace had been committed. But the law is, where the party, either by his behavior or speech, at the time of his entry, gives those who are in possession just cause to fear that he will do them some bodily harm if they do not give way to him, his entry is esteemed forcible, whether he cause the terror by taking with him such an unusual number of servants, or by arming himself in such a manner as plainly to indicate a design to back his pretentions by force, or by actually threatening to kill, maim, or beat those who continue in possession, or by making use of expressions which plainly imply a purpose of using force against those who make resistance," citing Wilson's case, 8 Term Rep., 357; Roscoe on Evidence, 374-377; 1 Hawkins Pleas of the Crown, ch. 64, sec. 27. If the facts recited in that case constitute forcible trespass at common law, surely the facts of this case must receive a like construction; and when the statute of Richard II. is considered, there can be no doubt as to the criminality of the defendants' conduct. This statute has been adopted, we believe, in most of the States of the Union. Discussing its provisions, the Court, in Scott v. Willis, 122 Ind. 1, said: "The owner of land who is wrongfully held out of possession by one who has no legal or equitable right may embrace the opportunity and gain peaceable possession if he can; but unless he can obtain possession without force or show of violence, his sole remedy is to (607) invoke the aid of legal proceedings." In Reader v. Purdy,41 Ill. 285, it is held that the statute against unlawful entry on land, by necessary implication, if not in terms, forbids a forcible entry, even by the owner, upon the actual possession of another. "It is urged," says the Court, "that the owner of real estate has a right to enter upon *Page 490 
and enjoy his own property. Undoubtedly, if he can do so without a forcible disturbance of the possession of another; but the peace and good order of society require that he shall not be permitted to enter against the will of the occupant, and hence the common-law right to use all necessary force has been taken away. He may be wrongfully kept out of possession, but he cannot be permitted to take the law into his own hands and redress his own wrongs. . . . It has been constantly held that any entry is forcible, within the meaning of this law, which is made against the will of the occupant. The statute of forcible entry and detainer should be construed as taking away the previous common-law right of forcible entry by the owner, and as providing that such entry must be therefore held illegal in all forms of action." This decision was approved in Chicago v. Wright, 69 Ill. 318. See, also, Hyatt v. Wood, 4 Johnson, 150; Ives v. Ives, 13 ibid., 235.
When the undisputed facts of this case are brought to the test of these principles, we find no difficulty in adjudging the defendants guilty upon their own best showing. The defendants formed themselves into a band of armed invaders, to execute their will and assert their alleged claim to the land, without regard to consequences and in defiance of law and order. They advanced upon the unpretentious and crude huts set up by the prosecutors' servants for their temporary use and comfort, with all "the pomp and circumstance of war" — a small battalion armed and equipped to meet any emergency and to overcome all opposition. This doughty band of warriors went forth to battle, bent on conquest or annihilation, and if they had not met with instant capitulation from a submissive enemy, there can be no doubt that there would have been a gory field of conflict. As said by the Attorney-General, "the (608) battle of the Dismal Swamp would have been on, and fought to the finish." They accomplished their unlawful purpose by expelling their adversary from the premises; and yet it is argued that, having the better title, they were in the exercise of their lawful right and within the pale of the law. We do not think so. The law of the mob is not a safe rule of conduct and is not the law of the Commonwealth, and the sooner this is realized by those who would essay to maintain their rights or redress their supposed grievances by becoming lawbreakers themselves, the better it will be for them and the peace and good order of society. We cannot too emphatically condemn such conduct as subversive of all good government and of the cardinal principle upon which it is based. If the citizen defiantly takes the law into his own hands to assert his rights or to punish others for violating them, whatever the provocation, he will soon find that the hand of that same offended law will be laid heavily upon him as an usurper of its prerogative, and he should be made to feel its weight and its just retribution. Right does *Page 491 
not always make might, nor does might make right, and the two united cannot be allowed to override the dignity and majesty of the law, to which law every good citizen should render willing submission and obedience. The doors to our courts are wide open, and any one may enter who feels aggrieved in respect of his person or his property, and he will find there a remedy for the full reparation of the wrong. If he will not do this, but will rather redress his wrong in his own way, he should not be surprised if he is made to pay the penalty of his own offense against the law.
The defendants' counsel cited Walker v. Chanslor, 17 L.R.A., 455, andSouter v. Codman, 14 R. I., 119, to support the position that one who has, in law, the title or right of possession may enter forcibly upon the land in the assertion of his right; but even a slight examination of those cases will disclose that they refer only to the civil liability of the owner for such an entry, and hold that he would not be liable in a civil action for the same, that is, in an action quare clausum, or trespass vi et armis, or for assault and battery, "even if the force used would subject the owner to an indictment at common law for a breach of the peace, or under the statute of forcible trespass (609) or entry." They do not reach this case. The possession of the prosecutor, by his servants and agents, was sufficient in this case to sustain the charge of forcible trespass, the entry having been made violently and with a strong hand, and those in possession having been intimidated and put in fear. Such conduct on the part of the defendants was an assault, as it compelled the prosecutors to desist from doing what they had the lawful right to do, at least, until the law had passed upon the disputed title. S. v. Daniel, 136 N.C. 571. In that case it is said: "The principle is well established that not only is a person who offers or attempts by violence to injure the person of another guilty of an assault, but no one by the show of violence has the right to put another in fear and thereby force him to leave a place where he has the right to be. S. v. Hampton, 63 N.C. 13; S. v. Church, 63 N.C. 15; S. v. Rawles,65 N.C. 334; S. v. Shipman, 82 N.C. 513; S. v. Martin, 85 N.C. 508, 39 Am. Rep., 711; S. v. Jeffreys, 117 N.C. 743. It is not always necessary, to constitute an assault, that the person whose conduct is in question should have the present capacity to inflict injury, for if by threats or a menace of violence which he attempts to execute, or by threats and a display of force, he causes another to reasonably apprehend imminent danger, and thereby forces him to do otherwise than he would have done, or to abandon any lawful purpose or pursuit, he commits an assault. It is the apparently imminent danger that is threatened, rather than the present ability to inflict injury, which distinguishes violence menaced from an assault. S. v. Jeffreys and S.v. Martin, supra. It is sufficient if the aggressor, *Page 492 
by his conduct, lead another to suppose that he will do that which he apparently attempts to do. 1 Archb. Cr. Pr., Pl. and Ev. (8 Ed. by Pomeroy), 907, 908."
All of which brings us to the conclusion that there is no reason why we should halt between two opinions in passing upon the guilt of the defendants. The evidence is all one way, and so is the law. It would be a reproach to the administration of justice if the law were (610) otherwise and we could decide the other way.
If we may compare this transaction with a great historical event, when Lord George Gordon assembled his followers in St. George's Fields to march upon Parliament and present their petition against Popery, we find that, while they were engaged in the exercise of the lawful right of petition, one of the highest and most sacred constitutional rights of the subject, and while their leader was afterwards acquitted by the jury, influenced as they were by the great skill and eloquence of Erskine, and not because he was less a lawbreaker, the Court of King's Bench (LordMansfield presiding), before which he and his followers were tried, did not listen with much patience or consideration to the plea that the righteousness of the cause justified the offense, and many of his less fortunate adherents were convicted of treason and executed. Charles Dickens, in his graphic description of the Gordon riots in Barnaby Rudge, makes Simon Tappertit say: "What's the matter here? Do you call this order?" Well might he thus exclaim, for not even can the most sacred right be unlawfully and violently enforced; and so the Court decided. 21 State Trials, 485 (563).
All the testimony offered by the defendants to show a constructive possession, that is, a possession of some other part of the land under a deed or color of title, was irrelevant and properly excluded by the court.
There are one or two of the other exceptions which require some notice. In his address to the jury, one of the prosecuting attorneys used this language: "The jury should find the defendants guilty, as their fines will be paid by the Richmond Cedar Works, a foreign corporation with headquarters in Virginia, a foreign State, where its officers sit back with slippered feet and direct this thing to be done." The defendants objected to these remarks at the time they were made, and the judge fully cautioned the jury, not at that time, but in his charge, to disregard them and to confine their inquiry to the single question as to the forcible entry. We think the caution was sufficient, but if not, the defendants should have requested the judge to make it so. This they did not do. Simmons v. Davenport, 140 N.C. 407. A request of this kind would have brought forth a proper response from the (611) court. "If a party desires fuller or more specific instructions, *Page 493 
he must ask for them, and not wait until after the verdict has gone against him and then, for the first time, complain of the charge." Simmons v.Davenport, supra. See, also, Kendrick v. Dellinger, 117 N.C. 491;McKinnon v. Morrison, 104 N.C. 354; S. v. Debnam, 98 N.C. 712; Clark's Code (3 Ed.), pp. 535 and 536; Justice v. Gallert, 131 N.C. 393; S. v.Groves, 119 N.C. 822. Speaking to an objection of the same nature as this one, the Court said in S. v. Tyson, 133 N.C. at p. 699: "A party will not be permitted to treat with indifference anything said or done during the trial that may injuriously affect his interests, thus taking the chance of a favorable verdict, and afterwards, when he has lost, assert for the first time that he has been prejudiced by what occurred. His silence will be taken as a tacit admission that at the time he thought he was suffering no harm, but was perhaps gaining an advantage, and consequently it will be regarded as a waiver of his right afterwards to object. Having been silent when he should have spoken, we will not permit him to speak when, by every consideration of fairness, he should be silent. We will not give him two chances. The law helps those who are vigilant, not those who sleep upon their rights. He who would save his rights must be prompt in asserting them."
But it must not be understood that we approve or commend the language of the attorney. It was a clear abuse of the privilege of counsel, as argued by defendants, to use such words in debate before the jury. The State does not ask for the conviction of a defendant except upon the facts and the law, stripped of all extraneous matter — the naked facts — and anything done which is calculated to prejudice the jury should be promptly rebuked by the presiding judge, and such instructions given to the jury as will remove all prejudice and restore their minds to an equilibrium, readjusting the unsteady balance, so that justice may be administered fairly and impartially. This is an important matter, and judges cannot be too alert or too much "on their guard" to instantly correct such abuses occurring in the course of the trial. It is their highest duty to do so, and they should at all (612) times be firm and prompt in its discharge. Sometimes, we are aware, learned counsel use intemperate speech in the heat and zeal of an argument which they, themselves, regret afterwards in their cooler and calmer moments; but this being so, it is nevertheless the duty of the judge to see that the trial is conducted fairly, without regard to that fact. Again quoting from S. v. Tyson, 133 N.C. at p. 698: "We conclude, therefore, that the conduct of a trial in the court below, including the argument of counsel, must be left largely to the control and direction of the presiding judge, who, to be sure, should be careful to see that nothing is said or done which would be calculated unduly to prejudice any party in the prosecution or defense of his case, and when counsel grossly *Page 494 
abuse their privilege at any time in the course of the trial the presiding judge should interfere at once, when objection is made at the time, and correct the abuse. If no objection is made, while it is still proper for the judge to interfere in order to preserve the due and orderly administration of justice and to prevent prejudice and to secure a fair and impartial trial of the facts, it is not his duty to do so, in the sense that his failure to act at the time or to caution the jury in his charge will entitle the party, who alleges that he has been injured, to a new trial. Before that result can follow the judge's inaction, the objection must be entered at least before verdict," citing Knight v. Houghtalling,85 N.C. 17. In the passage taken from S. v. Tyson, we did not intend to decide that a failure of the judge to act immediately would be ground for a reversal, unless the abuse of privilege is so great as to call for immediate action, but merely that it must be left to the sound discretion of the court as to when is the proper time to interfere; but he must correct the abuse at some time, if requested to do so; and it is better that he do so even without a request, for he is not a mere moderator, the chairman of a meeting, but the judge appointed by the law to so control the trial and direct the course of justice that no harm can come to either party, save in the judgment of the law, founded upon the facts, (613) and not in the least upon passion or prejudice. Counsel should be properly curbed, if necessary, to accomplish this result, the end and purpose of all law being to do justice. Every defendant "should be made to feel that the prosecuting officer is not his enemy," but that he is being treated fairly and justly. S. v. Smith, 125 N.C. 618. InJenkins v. Ore Co., 65 N.C. 563, Justice Reade said: "Zealous advocates are apt to run into improprieties; and it must generally be left to the discretion of the judge whether it best comports with decency and order to correct the error at the time by stopping or reproving the counsel or wait until he can set the matter right in his charge. It must often happen that the judge cannot anticipate that the counsel is going to say anything improper, and it may be said before the judge can prevent it, as in this case. . . . And the question was whether he was obliged to stop the counsel then and there and reprove him, or whether he would wait and correct that and all other errors when he came to charge the jury. Ordinarily, this must be left to the discretion of the judge. But still it may be laid down as law, and not merely discretionary, that where the counsel grossly abuses his privilege, to the manifest prejudice of the opposite party, it is the duty of the judge to stop him then and there; and if he fails to do so, and the impropriety is gross, it is good ground for a new trial."
In this case the judge responded fully and adequately in his charge to the objection, and the remarks of the counsel are, therefore, presumed to *Page 495 
be harmless. They were not what may be called a "gross" breach of privilege. It must be assumed that the jurors were honest and intelligent enough to heed the warning of the court. Besides, the defendants are guilty on the admitted facts, and therefore, in no degree have they been prejudiced.
The remaining objection to the conviction is that Davenport's associates were not aides and abettors, or, at least, that the courts erred in giving the following instruction: "If one party was committing the acts as charged, and others were present, either participating or ready and intending to aid or assist if it became necessary, all would be equally guilty." The defendant's counsel, in their excellent brief, criticise this part of the charge in the (614) following language: "This is undoubtedly not the rule governing aiders and abettors. The rule as laid down by Ruffin, C. J., in S. v. Hildreth, 32 N.C. 440, is that `the aider and abettor must either incite the principal to action, or else must deter others from interfering to prevent the criminal conduct of the principal.' The very limit of the rule is, the aider and abettor would be guilty with the principal if he was present with knowledge of the principal, ready to aid or assist. The reason is that this knowledge on the part of the principal emboldens him because he has the assurance of assistance. 12 Cyc., 186." Even within this definition of the term "aider and abettor," we find no difficulty in adjudging the other defendants guilty as principals, upon the facts of the case, for in misdemeanors there are no accessories. A person aids and abets when he was "that kind of connection with the commission of a crime which, at common law, rendered the person guilty as a principal in the second degree. It consisted in being present at the time and place, and in doing some act to render aid to the actual perpetrator of the crime, though without taking a direct share in its commission." Black's Dict., p. 56, citing 4 Blackstone, 34. An abettor is one who gives "aid and comfort," or who either commands, advises, instigates, or encourages another to commit a crime — a person who, by being present, by words or conduct, assists or incites another to commit the criminal act (Black's Dict., p. 6); or one "who so far participates in the commission of the offense as to be present for the purpose of assisting, if necessary; and in such case he is liable as a principal." 1 McLain Cr. Law, sec. 199. Within any well recognized definition, the codefendants of Davenport were at least "aiders and abettors," if they were not principals. Rexv. Gordon, 21 State Trials, 485.
We have discussed this case at much greater length than we would otherwise have done, because the learned and able counsel for the defendants insisted most earnestly and zealously that no forcible trespass had been committed under the law as laid down by the standard authorities, *Page 496 
and we, therefore, deemed it proper to review and restate the law in a matter so vital to the tranquility and welfare of the (615) community, and to do so in no uncertain terms, so that it may be well understood that individuals cannot usurp the power of the law, and, by their own procedure and in a violent manner, either protect or assert their rights of property. Such conduct is "against the peace and dignity of the State, and contrary to the statute in such cases made and provided." Again we say that the cry of the mob must not be mistaken for the voice of the law.
It may be added that the defendant could have been properly indicted and convicted either of a forcible trespass, a riot or rout (S. v. Hathcock,29 N.C. 52; S. v. York, 70 N.C. 66), or an unlawful assembly (2 McLain Cr. Law, sec. 1003), all misdemeanors at common law; and the sentence pronounced in this case by the able and humane judge, which was mild, considering the aggravated circumstances, has, therefore, worked no legal injury to them.
There is no apparent error in the case, and it must be so certified.
No error.
Cited: Saunders v. Gilbert, post, 474; S. v. Jones, 170 N.C. 754, 756;Massey v. Alston, 173 N.C. 225, 226.