The defendants were tried upon five bills of indictment, for offenses growing out of the same or interrelated transactions and consolidated for the purpose of trial: Two for assault with a deadly weapon, one for kidnapping, one for attempted burglary, and one for forcible trespass. They were convicted on the charges of attempted burglary and forcible trespass, and acquitted on the others.
The evidence for the State tends to show as follows:
Mrs. Marshall owned a country place in Caswell County, consisting of extensive grounds, containing the home, a near-by house occupied by *Page 195 
the caretaker, Jake Lowndes, and his wife and daughter, and a lake upon a small stream running through the property, which extended something like half a mile from the head of the lake upstream, and a quarter of a mile downstream below the dam.
Mrs. Marshall's husband was in the service of the United States, and was, at the time, Governor of Saipan under the Military, or Naval, occupation. Mrs. Marshall occupied the house at intervals, and when there Jake Lowndes and his wife stayed in the house in the servants' room, the latter as maid.
Some two weeks before the occurrences named in the indictments, the defendants had formed and expressed considerable ill feeling against Jake Lowndes because the latter had set nets at the head of the lake and, as they contended, stopped the run of the fish. They came by the Lowndes home, asked him out to the feed barn and wanted to know when "those damn fish were going to start running," and in leaving one of them said, "If you don't let me know when those fish start running, I'm going to raise hell."
On the night of the alleged occurrences made the subject of the indictments, Lowndes went to a neighboring store, and the defendants, with two boys, came up. It developed that they were going fishing.
There was considerable drinking of beer and wine, and Lowndes, at the invitation of defendants, rode with them in the direction of his home, all getting out of the car when they reached the home of defendants, on the way. The defendants walked on some distance with Lowndes. On the way there was a brawl amongst them, in which one of the defendants threw Lowndes to the ground and fell upon him, using profanity toward one of the boys who sought to interfere. Lowndes found it necessary to run in the direction of his home, and pursued by the defendants, finally evaded them. Later, arriving at his home, he found that his wife had gone up to Mrs. Marshall's, and followed her there.
Two boys, James Winstead and Ernest Hensley, testified that they were passing on the road, near the Marshall place, and that the defendants beset them on the way, and with profanity and at the point of guns (two shotguns) forced them to go with them first to Lowndes' house and then to the Marshall premises to call out Lowndes, whom Aubrey said they intended to kill. Henry said he had the "trick in his hands," referring to the shotgun.
The defendants went to Lowndes' home and searched it for him. They were told that Lowndes had gone up to Mrs. Marshall's, and followed him there. Here the two boys, after having witnessed much of what took place there, managed to get behind a hedge and escaped.
James Moore, witness for the State, testified: (R., p. 24.) *Page 196 
"I know Aubrey Gibson, Henry Gibson and Jake Lowndes. I was there on the night of the 18th of March. It was on Saturday night. While I was there that night Aubrey and Henry and James Winstead and Ernest Hensley come there. James Winstead come in. James Winstead was in front and Mr. Aubrey was behind him. They did not knock before they came in. Jake's daughter was in the room with me, two or three children were there. There was a screen door over the main door. It was closed. Aubrey had a gun with him. He didn't do anything with it when he come in the house. He said he wanted to see Jake. I told him where I thought Jake was. That he had gone up to Mrs. Marshall's house. He stayed there about three minutes, I reckon. He looked around in the other room. I heard no conversation between them. I heard them say they were going up to Mrs. Marshall's house. Mr. Aubrey said that."
Ernest Hensley, witness for the State, testified as follows: (R., p. 16.)
"When we got to Mrs. Marshall's we walked up there and around to the back, and when we got around to the back door they called Jake. I don't remember which one did the calling. He answered and they told him to come out there, they wanted to speak to him a minute. He told them he was coming out and about that time Mr. Henry walked around to the back door and James broke and run. Mr. Aubrey throwed the gun on him and told him if he run he would shoot him. James stopped and come back. Mr. Henry walked to the door and was shaking the door. And Mr. Aubrey and myself was standing on the side of the house and he walked up to the well and told me to stand back and this is when I got a chance to run. The well is about 4 or 5 yards from the door. The well is almost at the door. That is the door that Henry was shaking. Mrs. Marshall had hedges planted around there and I slid behind them and got away. He was just shaking the door. I don't know what part of the house this door opens into. I have never been in it. Henry was shaking the door."
Beatrice Lowndes, witness for the State, testified (R., pp. 17-18) that she had gone up to the Marshall place and gone to bed.
"Jake was out, but I knew he would come up there too, because she didn't have anyone to stay with her. I imagine I went to sleep and Jake come in in a little while and set down. He seemed to have mud on his shoes and he was cleaning his shoes and while he was cleaning his shoes we heard a shot and Jake says, `Did someone shoot?' and I said, `Sounds like it.' He got up and went out of doors. When he goes out he looks around and comes back in and goes to bed. All at once we was aroused by a loud noise coming around the house; someone was talking very loud, and saying things, and I wondered who it could be. I couldn't hear in the house and I said, `Jake, who can that be at this time of *Page 197 
night?' I thought, myself, it was someone who didn't know Mrs. Marshall was in. `Well,' I says, `maybe someone don't know Mrs. Marshall is in.' And I said I would go to the door and speak to them and tell them Mrs. Marshall was home. I opened it and someone come up to the door and I said, `Be quiet, Mrs. Marshall's here and don't disturb her, please,' and as I said that he come and pushed it, and he says, `I don't care about Mrs. Marshall.' I didn't know what he meant to do. It frightened me very much and I pushed the door together and fastened it. So then I rushed to let Mrs. Marshall know that someone was coming in the house, as I rushed through to the part where she was staying I met her coming. She had heard all the noise herself and was coming down. She didn't know what it was all about either, and she was putting on the lights and they departed somewhere.
"He pushed with all his force to come in and I pushed it together. I'm talking about Mr. Henry — Henry Gibson. I heard cursing around there; Mr. Henry was doing it when he came up on the step. He said, `I don't give a damn if she is here,' and he says, `Where is she?' He didn't say anything further, and I closed the door. He had a gun but he was pushing. I never seen the gun pointed towards the door; he had the gun to his side and was pushing the door. There is nothing that I know about this that I haven't told. I couldn't say for sure where the gun was fired; the sound of it was near the driveway, sounded like it. Mrs. Marshall had just returned from New York that morning and the children hadn't arrived. When Mrs. Marshall came down from her room she had a shotgun. She made a telephone call. We were all so nervous and frightened and we were calling so fast and we finally got connected with the Sheriff. The telephone is in the butler's pantry. There is no other phone in the house. That is the one she used. She called Sheriff Gunn."
Jake Lowndes, a witness for the State, testified: (R., pp. 18-19.)
"I stayed in my house about ten minutes and then went up to Mrs. Marshall's. That was about 11:30 o'clock. I went on in, took a seat, pulled my clothes off and cleaned the mud off. About twenty minutes after I got there I heard a shot. I couldn't tell where it was. I got up and went outdoors and didn't see anything and didn't hear anything. I then went back to the servant's room. I didn't go to bed right then until after the boys came. I didn't hear nothing else after they left. They were coming around the house when I first heard them and got around to the window. I could tell who it was after they called me. It was the Gibson boys, Henry and Aubrey. They told me to come out there, and I said, `Who is that?' and they said, `You know who it is, dammit, come out, and I want to speak to you.' I told them, `All right.' But my wife got to the door before I did, and told them they were making too much *Page 198 
noise, they would disturb Mrs. Marshall. She was at the door when Henry come up pushing against it. I didn't hear any knocking at the door. I could see Henry but I didn't see anybody else. I couldn't hear what he said to my wife as he came up to the door. And that is all I know about it."
In addition to this, Lowndes testified the defendants had no guns at the time he accompanied them from the store.
Mrs. Helen Marshall, witness for the State, testified (R., pp. 19, 20, 21) that she was at her home alone, with the exception of Jake and his wife, who were in the maid's room:
". . . I heard a shot. . . It sounded near the garage. When I heard the shot, I tried to settle back in bed and I guess it was about ten minutes, probably fifteen, and then I thought I heard voices out back of the garage, and I got up and stood in the French doors in the dark, and I saw four figures behind the back wall, and just as I looked out there one of the figures broke and tried to run away from the others, and this voice, with perfectly dreadful profanity, cursed him and said if he ran he would be shot. And then I heard somebody say, still with these filthy curses — I never heard such profanity in my life. He went on to say, `Well, if he doesn't open the door we will blow it in,' and with that I realized I had a shotgun there with two shells and that was all I had. . . . I took the gun downstairs with me and had it beside me at the telephone, and when I was calling the sheriff I said, `If they come in the house, I am the one that is going to shoot them.' I was very frightened. The figure who tried to run came back. He broke away. He cursed him and called him, `James, if you don't come back here I'll blow your black head off.' He came right back. When I got down to the telephone, I said, `Well, what in the world is this?' I said, `Somebody is trying to break in the back door. I will try to get the sheriff. If I don't get the sheriff, I will just have to shoot whoever it is.' Of course, flashing the light on upstairs seemed to have frightened them quite severely. They were still there around the back door when I got to the telephone. They probably heard me yelling to the sheriff on the telephone. I couldn't hear whether they were using obscene language. My room was all open. The well is about as far from here to the post. . . . I should say it was about 15 minutes between the time that I first discovered them until the time they left. He had obviously tried the kitchen door when he made the statement, `If he doesn't open it we'll blow it in,' with the profanity that goes with it."
Sheriff Gunn testified: (R., p. 24.)
"On the night of the 18th of March I was called by Mrs. Marshall. Well, I had gone to bed when the phone rang. I went to the phone and it was somebody that looked to me like they were in distress. They said, *Page 199 
`Come quick,' somebody was about to break in their house. I finally left her talking. When I arrived down there she was pretty nervous. I did not find the Gibson boys there. We looked around and found some tracks that went out by the wood house. It had been raining that night. . . . I hung up the telephone in the lady's face while she was still talking."
The defendants put on evidence in contradiction. Henry Gibson admitted that he got the gun from home after the scuffling incident, but said Lowndes had hit him with a bottle, and he knew nothing more until he found himself at Mrs. Marshall's with the gun in his hands. He said his wife told him she tried to keep him from getting it. The defendants testified they were hunting Lowndes to find out why he had hit Henry. They denied substantial parts of the State's evidence.
The defendants at apt times demurred to the evidence and moved for judgment of nonsuit.
The jury returned a verdict of guilty as to each defendant on the indictments for forcible trespass and attempted burglary, and acquitted them on the other charges. From the ensuing sentences both appealed.
The appeal of defendants poses the question whether the evidence was sufficient to go to the jury upon either of the offenses of which they were found guilty, and as to either of defendants. However, there was sufficient evidence that they acted in concert throughout the transactions culminating in the indictments, and the cases may be discussed without distinction as to their participation.
The Court is of the opinion that the evidence on the charge of attempted burglary is not sufficient to be submitted to the jury. The judgment overruling the demurrer to the evidence and declining the motion for judgment as of nonsuit is therefore, as to that charge, reversed.
The evidence relating to the charge of forcible trespass was properly submitted to the jury. The objection of the appellants seems to be that the proof of the offense fell short of the accepted definitional standards in that the defendants were not ordered from the premises, or, at least, that the occupants or owner did not exhibit that ordinary firmness in resisting the aggression, which, unavailing, might give rise to an inference of force.
Forcible trespass, using the term as the equivalent of forcible entry under the statute, does not at all times, and under all circumstances, require the vocal protests of the owner of the invaded premises to get into *Page 200 
the category of punishable offenses. The manner and purpose of the invasion, the show of force, conduct calculated to intimidate the owner or lead to a breach of the peace, and the knowledge on the part of the aggressor, however acquired, that the invasion is against the will of the owner, are circumstances to be considered. G.S., 14-126; S. v. Oxendine,187 N.C. 658, 122 S.E. 568; S. v. Fleming, 194 N.C. 42,138 S.E. 342; S. v. Tyndall, 192 N.C. 559, 135 S.E. 451; S. v. Earp,196 N.C. 164, 145 S.E. 23; S. v. Davenport, 156 N.C. 596, 72 S.E. 7; S. v.Pollok, 26 N.C. 305; S. v. Jacobs, 94 N.C. 950.
There does not seem to be any other reasonable conclusion than that the conduct of the defendants from the moment they entered the premises until they finally left was of such a lawless and intimidating character as to put the occupants of the premises, and especially the owner, Mrs. Marshall, in a state of extreme fear, and to make the ordinary means of resisting trespass unavailable.
On the charge of forcible trespass and as to each defendant, the order overruling the demurrer to the evidence was proper, and we find no error.
On the charge of attempt to commit burglary,
Error and reversed.
On the charge of forcible trespass,
No error.