The appealing defendants and one George Otho Smith were indicted on the following bill of indictment: "The jurors for the State upon their oath present, that Roy Kelly, George Otho Smith, Wade Hanford and Ralph Hanford, late of the County of Alamance, on the 7th day of December in the year of our Lord one thousand nine hundred and thirty-eight, with force and arms, at and in the County aforesaid, while engaged in the perpetration of the crime of store breaking and larceny, willfully, unlawfully, feloniously and with premeditation and deliberation, and of their malice aforethought, did kill and murder one M. P. Robertson, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State. W. H. Murdock, Solicitor."
The record discloses that about 2:00 o'clock a.m., on the morning of 7 December, 1938, there was an attempted and partial robbery of the Sprinkle Service Station, in Burlington, N.C. near the underpass. The building is of metal type construction, with glass front and sides. It is 38 feet paved from the edge of Trade Street to the Sprinkle Service Station. All the witnesses who testified were State's witnesses. Defendants introduced no evidence.
(1) Roy Kelly. Evidence in part against him: A voluntary confession made to Sergeant T. J. Davis. He stated: "I am going to get it off my chest and tell you about it and the way I tell it is the only way it can prove out in court." "He said on the night of December 6th that he, Wade Hanford and George Smith and Mary Fitts and Myra Buckner and Ralph Hanford rode from the Green Top Inn into Burlington and they went to the show, but I don't remember whether he said he and Wade went to the show, anyway he said they got together on Worth Street in Burlington and went back to the Green Top Inn where they were to meet Roy Huffman at 12:00 midnight and Roy had not got there. Right in there he said George and Ralph went away and they were to come back and he said George and Ralph came back. George Smith and Ralph Hanford at a little past 12:00 and Roy Huffman had not shown up so he got George to carry him to the Wagon Wheel about a mile and a half from the Green Top Inn to see if he could locate Roy Huffman, which they did. They went in George Smith's car. He said they found the Pontiac and that he went in the cabin and found Roy Huffman and Helen Holder and he asked Roy if he had forgotten what they were supposed to do that night and he said No, he had overslept and on the way out he got his scarf and overcoat out of his bag and went back to the Green Top Inn, and in a few minutes Roy Huffman came and the five left in the two cars going to Burlington to rob this gas *Page 630 
station. He did not mention the name of the gas station. He said he and Wade and Ralph and Roy Huffman had been planning to rob this station for two or three days. They came in near the Buick salesroom and stopped there to talk it over. He said they used two cars, 1937 Pontiac he was driving and 1935 Ford, Smith was driving. That they stopped and talked it over and the tools they were to break in with were in Kelly's car, the Pontiac, and they taken them out and put them in Smith's car and Roy Huffman and Ralph Hanford and Wade Hanford got in Smith's car and drove down to the place and Smith stopped on a side street near the service station and he stopped about thirty-five feet back of Smith's car. The seat in Smith's car had been loosened some time in the early evening to enable them to get the safe of the gas station in the car. He said that they knew they could not get the door shut after getting the safe in there and he was to stay back of Smith's car in case the officers got after them and he was to block the officers in case the officers drove up. He was to stay between Smith's car and the officers so the officers could not get to Smith's car, knowing the door would have to be open on Smith's car. He said they drove down there and saw Roy Huffman and Wade and Ralph get out of the car and go to the station. In a short time Roy Huffman came back to his car with some oil and anti-freeze and put it in his car and he saw one of the Hanford boys go back to George's car and put some package in there and return in the direction of the gas station. Immediately after that he said he heard the shooting and George Smith started his car and turned around in the street and drove away and he backed up into the side street and waited for a second to see if any of the rest were coming and they did not and he drove on down Main Street in Burlington. Drove back by the station and saw a man lying there with an officer's cap, and after that he went back to the Green Top Inn and saw George Smith in the act of turning around and asked him what had happened and he told him, `You know as much about it as I do,' and they went back to Hanford's home and found Wade and Ralph and they went back and parked on the side road to try to decide what they would do with Helen Holder. Said he finally decided to go get her and he brought her back there and they all talked about what had happened and the shooting and all, and decided to separate and not be seen together, but he said he asked Wade to go with him. Wade told him no, he was going to Haw River to Minnie Goodman's, where he could establish an ironclad alibi, she would say he had been there all night, and he had not seen them since, and late that evening he carried the Holder girl back to Greensboro. He said that when the shooting started Huffman fell. One of the Hanford boys said that, I don't remember which one, and that they dropped down there and after the shooting was over they ran out *Page 631 
and went home. He said he had a .45 automatic and that Wade Hanford had a .32 special Smith Wesson pistol. I think he said he had two, but I won't be positive about that. He said he didn't see any arms on the rest of them. He said that he was an escaped prisoner and escaped with Roy Huffman, to Richmond, Va., and was brought back from Richmond. He didn't say he saw them go into the filling station. He said they went to the filling station and returned there with the oil, Huffman bringing some oil and some anti-freeze to his car and one of the Hanford boys carrying some to the Smith car. . . . From the things he told me about it I can tell you where it was parked so far as I know. I would say it was about 50 or 60 yards from the station."
The court below instructed the jury not to consider the confession as evidence against any of the other defendants but only against Roy Kelly. This testimony was corroborated by George Smith, which directly involved him as being a particeps criminus; also by Helen Holder.
C. A. Stanford testified, in part: "I am chief of police of the city of Burlington. I received an early morning call on December 7, 1938. I dressed and went to town. I went by the police station and went on to the service station. I stayed in the police station about one minute and went to the Sprinkle Service Station, which is located on Church and Trade Streets. When I arrived at the station I saw the bodies of Officer Vaughn and Sheriff Robertson. (Witness points out on the diagram the location of the bodies.) Vaughn's body was about twenty-five feet from the door of the service station, and Robertson's body at about ten feet from the building. The door is about ten feet from the corner. I found near the body of Officer Vaughn a pistol and flashlight. His flashlight was turned on. I made an examination of the interior of the Sprinkle Service Station. In there I found the body of Roy Huffman. I did not know him at that time. It was lying between the desk and the safe. His feet were towards the desk and his head toward the safe. I found near his body a .45 automatic revolver. I have that gun with me. (Witness produces gun. Witness explains condition of the gun when he found it.) When that gun shoots the last shell in it, it stays that way (illustrates with gun). When it ejects the last shell it stands with the ejector back. Roy Huffman was lying on his left side. The gun was right at his right side by the edge of his body. I searched the body of Roy Huffman. The coroner and myself searched him together. We got twelve .45 shells that had not been fired out of his pocket. We got a pocketbook with some identification in it, but it was not Roy Huffman's pocketbook. I cannot recall the name on the identification card. We found one cartridge in the desk drawer. There was a hole in the desk drawer. That was a wooden desk drawer with heavy wooden handles. It was shot through the handle into the desk and made a dent in the side *Page 632 
of the drawer and it was in there. It had not gone through. There was a gallon can of anti-freeze on the desk. It was on the corner of the desk near the door where the gallon can was sitting. The can had a hole shot through it. It appeared to have gone from the inside of the building and towards Church Street. I found one bullet near the stove on the floor. It was a .45 type. I found five empty shells out of the .45 in the service station. They were scattered. Some were behind the oil. They have some oil cans sitting near the wall and some were behind that. We picked them up in different places in there. I found four .32 cartridges that had not been fired under the desk on the floor, right under the leg of the desk near the door. They had not been fired."
Wade Hanford made a voluntary statement as follows: (The court instructs the jury that this statement alleged to have been made by Wade Hanford may be considered by the jury as evidence against him, and not as evidence against any of the other defendants.) "Statement of Wade Hanford of Burlington, N.C. as told to R. B. Christian on the 23rd of January, between the hours of 3 to 5 a. m. We were talking about Roy Kelly and Wade said Kelly was talking too damn much, the long-tongued S — of a B — . I asked him if Kelly had told anything on him. He said that Kelly had talked too damn much. I asked him if Kelly was at the filling station the night of the killing of the two officers. He said he was just above the filling station at the time of the shooting and that Kelly and Smith ran when the shooting started and left him and Ralph and Huffman at the filling station. He said Huffman was behind the desk in the filling station and he was down behind the safe door. He said Huffman was shooting at the officers. He also had two .32 S. W. pistols, and that he had hid them before he left North Carolina. Ralph had one of these pistols the night of the shooting. He also told about Ralph wrecking a Zephyr-Lincoln on a curve while trying to make 100 miles per hour, and that this car belonged to Smith, and that he, Ralph and Smith later pulled a $4,000.00 job and Ralph gave Smith $1,000 of this and he gave Smith $500 of this $4,000 for the wrecked Zephyr-Lincoln and that was when Smith joined him and Ralph in these robberies. Wade told me about Huffman jumping up from behind the desk when he was shot and that he came out with his hands up when he saw Huffman was dead. Wade said he tried to get Huffman to talk to him but Huffman was struggling and never spoke after he was shot. When he came out of the place he say the other officer, whose name is Bailiff, running away from the place as though going for more help. He also said that Ralph and himself walked away from the filling station after the shooting. Smith and Kelly had run off and left them and he next saw Kelly and Smith at a tourist place where they had been staying near Haw River or Burlington." "I didn't say that I wrote that down *Page 633 
as he stated it. I wrote it immediately. I had this pad in my car outside the hospital. I went out and got this pad and took a memorandum of what he told me. I wrote it no longer than two minutes after the statement was made. I wrote it from memory. My memory was fresher then than it is now as to what he said."
Mary Fitts testified, in part, that she knew George Smith and on Tuesday morning, 6 December, was with him. She told in detail the conduct of the parties that day. On cross-examination she testified: "I knew George Smith at Roanoke Rapids. That is his home too. I went with him. I was his sweetheart and had been going with him about a year. I had never been with him to `Correct Time Inn' before. . . . They knew that I was George's sweetheart. They did not tell me they had arranged for George to turn State's evidence. I did not know it and did not know what arrangements had been made with my sweetheart's attorney for him to become a witness in this case. Nobody had said that to me. Have had no conversations with George Smith since then and nobody has ever mentioned it to me. The drinks referred to were whiskey. I don't remember the number of drinks of whiskey we had that night. I can't give the jury any estimate of the number. I don't know whether Ralph Hanford and Wade Hanford were drunk that night or not. They were drinking. I was not drunk. I don't know how many drinks it takes to make me drunk. I have never been drunk. I took about three or four drinks. I did not take any at the `Correct Time Inn.'"
Myra Buckner testified, in part: "I know Ralph Hanford. I have known him about three and one-half years. Met him at his home in Burlington and have been going with him since that time. I was his sweetheart. I saw Ralph on the morning of December 6th at his home. . . . We stayed at the `Green Top Inn' until after three and went to the `Wagon Wheel.' Ralph Hanford, George Smith and Mary Fitts were along in George's Ford. Helen Holder, Roy Kelly and Roy Huffman joined us there. From there we went to Hillsboro. On the way we stopped at some place and picked up Wade Hanford down near Haw River. Then we went on to Hillsboro to a place where they dine and dance. All eight of us were there. Stayed there around two hours. From there we came back to the `Green Top Inn.' I came back with Ralph Hanford, Wade Hanford and Roy Kelly in the car. The others joined us at the `Green Top Inn' — Mary Fitts, George Smith, Helen Holder and Roy Huffman. We left `Green Top Inn' around seven o'clock. I left with Mary Fitts, Ralph Hanford, George Smith, Wade Hanford, Roy Kelly and went to the show in Burlington. Ralph Hanford, Mary Fitts and George Smith went with me. Got out of the show about 9:30 o'clock and went to a cafe and had something to eat. Roy *Page 634 
Kelly and Wade Hanford joined us there. I was in George Smith's car. From there we went to the `Green Top Inn,' arriving there a little after 10:00 o'clock and left around 11:00 o'clock. Mary Fitts, Ralph Hanford, George Smith and I left together in George Smith's car. We left Roy Kelly, Wade Hanford at the `Green Top Inn.' We went to `Correct Time Inn,' rented a cabin with two rooms. I occupied a room with Ralph Hanford. This cabin has one door to the front and another that goes into the garage. We all entered the same door. Ralph Hanford and George Smith left us there around 12:00 o'clock. They returned something between three and four o'clock. I let them in. We left the cabin around 10:30 and 11:00 next morning. . . . (Cross-examination.) Ralph Hanford was good and drunk that night and so was Wade. They were both drinking very much, I don't know if they were drunk."
Helen Holder was permitted to testify that Roy had been sentenced to prison and escaped and she saw him last fall, about 20 November. The court below charged that this was no evidence against the other defendants. She testified further: "Roy Kelly was with him. He came to my house in Greensboro. Kelly was with him. They were driving a 1937 Pontiac. We went to ride around Greensboro. The next time I saw Roy Huffman was four or five days later. On that occasion Roy Kelly was with him. They came to my home. I left with them then. We went to Washington, D.C. . . . I stayed with them until the 4th or 5th of December, from about the 28th or 30th of November to the first part of December. I was Roy Huffman's girl. . . . I heard Myra Buckner and Mary Fitts on the witness stand and heard them relate a trip to a dance and dine place near Hillsboro. I was on that trip. Ralph Hanford, Wade Hanford, George Smith, Mary Fitts, Myra Buckner, Roy Huffman, Roy Kelly and myself. I heard them testifying about coming back to the `Green Top Inn' on that day after we left and came back to Hillsboro. It was about a quarter of 7:00. I left with Huffman in a 1937 Pontiac and went to the `Wagon Wheel.' That is a dine and dance place. It has cabins. There we rented a cabin, Huffman and I. I occupied the cabin with Huffman. He left me about 12:00. He never returned. The next person I saw on that night after Roy Huffman left in the cabin at the `Wagon Wheel' was Roy Kelly. He came out to the cabin and told me to get up and dress and I did. It was about three in the morning. . . . Kelly came back to the cabin and told me to get up and dress, and I got up and dressed and when we got to the car he told me Huffman had got shot and I asked him how he got shot and he said that he and Huffman and some other boys went to rob a place and they went in and the safe was open and the officers drove up in front and Huffman started to shooting and that Huffman got shot. Kelly and I went to some little country road around *Page 635 
Graham or Burlington. I don't know just where it was. There we met Ralph Hanford, Wade Hanford and George Smith. There was another automobile there but I didn't know whose it was. It was a 1935 Ford. Ralph Hanford, Wade Hanford and George Smith got out of the Ford and got in the Pontiac and we all five sat in the Pontiac and talked. I think Ralph was the first that spoke. He said he went in the place and he told it like Kelly did. The safe was open and the officers drove up in front and Huffman started shooting and the two officers fell and someone shot Huffman and he fell, and he said it was Ralph Hanford and Wade Hanford in the place and Roy Kelly was in the Pontiac. He was parked in a side street. This was Ralph talking and all of them present in the same automobile. Everyone could hear everything and everyone else talking. Smith was there. Ralph said that Roy got shot twice and he didn't fall and the third time he fell and when Roy Huffman got shot the third time it was through the left arm. Ralph said he got shot through the left arm and said that Roy fell and by that time he was dead and said they got out and got in the Ford and left. . . . After we got together in the car all the boys were telling each other to keep their mouths shut and not to talk and each one was saying he knew he would not talk and he said he thought it best to split up for a few days so that people would not see them together. . . . On these occasions when I would ride along with Huffman and Kelly I saw one gun. It was in the car. I mean pistol. It was a .45 in the pocket of the car. . . . (Cross-examination.) I am 17 years old. Live in Greensboro with my mother and father. I came to Burlington with Roy Huffman and Roy Kelly around the 3rd or 4th of December. I think it was some time the last of the week. We stayed at the `Correct Time Inn.' I met Kelly about the 20th of November. Went to Washington and came back to my home and then came down here. We stayed all night at the `Correct Time Inn.' There are houses there. I occupied a room with Roy Huffman. . . . Ralph in my presence said he was there and Kelly said he was in a Pontiac watching. They were talking to each other. They pleaded guilty in my presence. . . . They put me in jail in Reidsville but did not charge me with stealing chickens. They found me with the chickens. I stole somebody's chickens in Rockingham since I have been on this case. Did not tell mama about that. I was with Roy Huffman on the 6th. I meant to tell Mr. Glidewell that I was with the man that stole the chickens. I didn't steal the chickens myself. I have never been tried for anything. He was tried for it and convicted."
D. V. Bradley testified that he was proprietor of the Sprinkle Service Station. He further testified, in part: "I had in the way of merchandise motor oil and anti-freeze and a few belongings that you have to have *Page 636 
with a service station, such as extra hose and bulbs. Had a large desk. . . . It was there on December 7th. The door was closed when I left there on the previous night and locked. Both doors of the safe were open. The door opened to the right. We had a line of three oil drums, oil and anti-freeze. I had a little space where they sat, sitting stacked up in the corner and the anti-freeze on top of them. I left the station the night of December 6th fifteen minutes after eight o'clock. There was nobody at the station when I left. I locked the station. It has a Yale lock placed into the regular long door lock, steel lock, and this lock is manufactured in there from the cold steel company, and we lock that, and it is about an inch and a half that turns into the lock and locks the door. The door is of cold steel, double ply. I saw the building after leaving that at 8:15 the next time at 3:30 next morning. I came to it at that time. I found the door had been forced open, the officers were in the place and a number of people gathered about. The lock was in bad condition. It had been forced by a heavy bar of some description, had pried the steel holding it on each side to a bulged condition, and that wrecked the part that held the lock on the wall and door frame to one side, showing it had been forced by a heavy instrument of some type. There was a dent right across the lock that had bent the lock way in, causing the lock to give way, and another dent just above it that indicated that something behind the instrument had been used as a scotch, while pushing it in, or a bushing. Three windows were broken out. One had just a hole of a bullet through it, one was completely out, the other was about two-thirds out and powder burns on the window. I observed the merchandise that was in the building when I left there the night before and observed the merchandise that was in it when I went back the next morning. I am sure I missed one case of Penn oil and one case of Superpyro anti-freeze put up by the Firestone people. Each of those contained six gallons in quart cans. The safe is an all steel safe, a small size safe. It stands approximately three feet high. The safe is about as high as the top of that table and about 2 1/2 feet across. It weighed 800 or 1,000 pounds. I have not seen either of the cases I missed since that time. . . . The place was lighted by two street lights about 300 feet away, also the Pickett Hosiery Mills, which has power lights in a number of windows. . . . I can see the keyhole the darkest night that comes, so that I do not have to turn on a light to see it. That is how well it is from the street and from the mill lights. When I got there at 3:30 these two lights were burning and burning at 8:30 when I left."
Norman Yates testified, in part: "I am nineteen years old. I live in Durham now, working there. In December, 1938, I was living at 311 Fisher Street, Burlington. At that time was working for the Melville *Page 637 
Dairy. I was delivery boy and salesman. Went to work at 2:00 in the morning. Went to work on the morning of December 7, 1938. I went up Fisher Street. I came from the north. I came down Trade Street to intersection of Trade Street and Graves Street. I came in on opposite side of the station. It was ten minutes until 2:00 o'clock when I got to the intersection. At the intersection I took Church Street on the side that is paved going toward the underpass. That is in the direction of the main part of Burlington, and in the direction of the Melville Dairy where I was employed. I noticed three men. One was standing at this corner of the station, one at that corner, and one at the door. Could not tell what they were doing. I know that two of them were white men. The moon was shining and they were turned one side of their faces toward me. That time I continued walking on toward the underpass on Church Street. I walked on the sidewalk. Just before I got to the underpass I scraped my foot on the sand that made a noise. I looked toward the station and when I made a noise they left their posts. This one left from this corner. They were between the air stand and these pumps. They were mumbling but I could not understand what they were saying. I continued up Church Street to the underpass and turned down Front Street and went to police headquarters and reported what I saw. I saw Sheriff Robertson, Officer Vaughn, and Officer Bailiff. After I reported what I had seen they got in an automobile and left in Sheriff Robertson's car. I don't remember who was driving. I continued on to Melville Dairy and went to work. Arrived there about five minutes after two. I was supposed to be at work at two. I learned about 5:30 o'clock that Sheriff Robertson and Officer Vaughn had been killed."
F. B. Bailiff testified, in part: "I am a police officer of the city of Burlington and was so engaged on December 7, 1938. I was working on the third shift. I went to work at 11:00 on December 6th. I was at the police station at approximately 2:00 a. m., on the morning of December 7, 1938. Sheriff Robertson and Officer Vaughn and Sergeant Ausley were there. I know Norman Yates who just left the stand. He came to the police station that morning. He said there was someone breaking the Sprinkle Service Station beyond the underpass. In consequence of that report we got in Sheriff Robertson's car and went over there. Sonny Vaughn accompanied us. We arrived at the Sprinkle Service Station a little after 2:00, I don't remember the time. We went out Church Street, right the other side of the new underpass and drove up in front of the door and me and Mr. Robertson — he got out the left side of the car and I got out on the right and Vaughn got out on the left. Mr. Robertson's car was an Oldsmobile sedan. He parked it right in front of the door. When we got there I crossed behind and went to the corner *Page 638 
and he went in front of the door. Vaughn was behind him. The lights were not turned off before the three of us got out of the car. I mean the car lights, headlights. There is a street light right by the stop light on the highway if I recollect. As I got behind Sheriff Robertson to get to this corner of the station I got a glimpse of two people inside the station. There was no light inside the station at that time. As we three officers approached the front of the station I think the door was open, I am pretty sure it was. Sheriff Robertson walked up into the door and I walked to the corner and when I got to the corner the light was shining good enough that I could see some fellow jerk out a gun and I hollered `Look out' and when I did we started shooting, I mean me and the fellow inside. I don't think that Robertson or Vaughn fired a shot. There wasn't much difference who started shooting first. I shot twice and I saw some fellow fall inside the station and I looked around and saw Mr. Robertson and Vaughn falling, and I knew there was someone else in there and I ran for some help. I ran up Trade Street to the warehouse and got to a telephone and called Sergeant Ausley for some more help and the ambulance that we had two men shot. I didn't know whether they were dead or not. I had a .38 Service revolver. I fired twice. . . . I shot through the second glass, threw my gun against the glass and pulled the trigger. The man I shot and saw fall was a white man. I cannot tell how many shots were fired then. I later learned that the man I killed in the station was Roy Huffman. Robertson was shot three times and Vaughn was shot twice. I don't know whether there were any more shots fired or not. It all happened so quick. It sounded like there were two shooting the best I could tell."
W. B. Linens testified, in part: "I live in Burlington. I work for Rich and Thompson Funeral Home as an embalmer. I was called to the Sprinkle Service Station on the morning of December 7th. I went in an ambulance. I was called between 2:30 and 3:00 o'clock, I think. When we got to the Sprinkle Service Station we found Mr. Sonny Vaughn and Mr. M. P. Robertson outside the station. Robertson was to the left of the front door toward the pump, possibly ten feet from the front door. Vaughn's body was out beyond these pumps back toward the street. The coroner was not there when we got there, we called him. Did not move the bodies until after the coroner came. I would say it was 20 or 25 minutes. The men were dead when we got there. Took the bodies to our funeral home. The coroner came over and examined them. We were all there when we examined them. We embalmed them. We always do in cases like that. I helped make the chart. I observed the holes in Sheriff Robertson. We found eight holes in Sheriff Robertson's body. Eight different ones. We found they were bullet holes. . . . The shots went straight through. One hole was in the *Page 639 
right arm, just above the elbow and straight through the chest and came out on the left side. There was a hole in the back between the shoulders about midway, and also one on the left side just below the ribs. That is four. There was also one on the left leg, and another over here on this side. I mean on the outside of the left leg. This was superficial. That makes eight. That is all. I assisted in embalming the body of Mr. Vaughn and made an examination as to how many holes were in his body. I made a record of what I found. Here it is. I found two holes in the body and one on the finger. There was one hole here in the chest, the front part of the chest, and one about an inch below it, about an inch apart on his chest, in the middle of his chest. One on the third finger on the left hand in the first joint. It was kind of torn there. It wasn't completely off, just a little skin holding it. There were eleven shots in all in the two officers."
(2) George Otho Smith. The States accepted a plea of second degree murder as to George Smith. He testified in part: "I live in Roanoke Rapids. Have lived there about 25 years. I operate some trucks, dump trucks hauling gravel for the State. Have been in that business three years. Was in that business in December, 1938. I am married. Do not live with my wife; have one child. I was in Burlington on December 6, 1938, came to Burlington the night before, December 5th. I knew Wade Hanford before that time, have known him about three years. Met him in the penitentiary. I went through the walls of the penitentiary at that time. I was going to Hillsboro to a camp and I spent one night there. I was a prisoner and met Wade Hanford there. I know Ralph Hanford, met him in 1932 on the chain gang. He was on the chain gang with me at that time. I didn't know Roy Kelly. I now know Roy Kelly. . . . I went to Haw River, Myra, and Mary, Ralph and I, Roy Kelly, Roy Huffman and Helen Holder went to Haw River. It was Minnie Goodman's place. Saw Wade Hanford there. From Minnie Goodman's place we went to a place near Hillsboro where we danced. The eight of us went to Hillsboro. From Hillsboro we went back to the `Green Top Inn.' . . . We all got together again. From there we went back to the `Green Top Inn.' Got back there I imagine about 10:00 o'clock. That afternoon when we went over to Minnie Goodman's Wade mentioned to Roy Huffman that they might as well go down and get a safe that night and that is all that was said about it at that time. . . . Then we went to the `Correct Time Inn,' Ralph and Myra and Mary and I. I don't know where Roy Huffman was. Kelly and Wade were at the `Green Top Inn.' When I started to leave Wade asked me if I would come back out to the `Green Top Inn' and I told him I would. After we had gone to the `Correct Time Inn' I was coming back to the `Green Top Inn.' He said to come *Page 640 
back about 12:00 o'clock. We got to the `Correct Time Inn' about 11:00 o'clock and stayed until about 12:00 and then went back to the `Green Top Inn.' Found Wade and Kelly. . . . We went to the `Wagon Wheel,' I stopped in front of the place and he went around to the cabin and said he found Roy around there in the cabin. . . . Saw Huffman again that night, just a few minutes after we got there he came up. Wade was at the filling station. Ralph was with him. Saw Roy Kelly, we were all at the filling station — at `Green Top Inn.' This was about a quarter of one I imagine. Roy Huffman called me out to the back of the filling station and he went out across a fence in a pasture to a stump hole and reached in and got a jar and pulled a small bottle out of the jar and said that it was nitro-glycerine, and said he wanted to use my car to go down to carry a safe from the Sprinkle Service Station. . . . When we got to the filling station he called Kelly and told him he wanted him to go down and put the safe in my car and drive his car behind so if anybody got after us, he could block the road. Kelly said all right, he would. The Hanfords were inside the filling station. The seat of my car was loosened so you could get a safe in it. . . . About that time Roy Huffman walked out of the place and came where Wade and I were talking and asked Wade if he was not going down to get the safe and he said yes he was and that is when we took the seat out of my car. We left the `Green Top Inn' and went over to Burlington, went in about two blocks of the filling station and I told Huffman I did not know where the place was and he said that he would show me. Ralph and Huffman were with me. Wade and Slim were in a Pontiac right behind us. Slim is Kelly. Roy Huffman told me to park my car and I parked it on the side of the street and Kelly drove up and we all got in his car and we drove past the filling station and he pointed it out and said that was the place and we drove around two or three blocks and went back to my car. Then Ralph and Roy Huffman got back in the car with me and we drove down within a half block of the filling station and parked on the side of the street. . . . We parked on the right side of the street about middle ways of the block. Kelly's car about thirty feet behind mine. From the place we parked, I could see the filling station. . . . When I parked on the side of the street, Ralph and Roy got out and took their overcoats off and laid them in the car and Roy Huffman told me to be careful that the nitro-glycerine was in his overcoat pocket and they started across the street and Wade Hanford joined them. Wade was in the other car. They went straight down in front of the filling station to the front door and started to break the door in. They had a screwdriver and a small crowbar and just as they started to break the door in a man came to the corner and turned the corner, and they saw him, and ran behind the filling station. He walked along there and *Page 641 
almost stopped looking at them and as soon as he got past the filling station, they came back around and started to break the door in again and this fellow ran it looked to me like. I could see him when he got past the filling station and it looked like he started to run. They broke the door in and in a minute they came out with three cases of oil, one apiece, Wade, and Roy Huffman carried their cases to the Pontiac, the one Kelly was driving. Ralph Hanford brought the other case to my car. I asked him what it was and he said cylinder oil and told me to open the door and handed it to me and I put it in the back seat. I asked Ralph, `Did you see that fellow come down the street?' and he said `Yes' and he turned around and about that time Wade and Huffman had started back down there and by that time he started back. I told Ralph that fellow has gone after the law. I saw him running and Ralph kept on walking just like he did not hear. . . . I turned to the left and went out the highway and drove around I reckon five minutes trying to find some place to put that oil. I did not want to have it in the car. I finally found a side road and turned up and hid the oil in the woods and got the bottle of nitro-glycerine out of Huffman's pocket and put it with the oil and then I went back on this same street and then went out to the `Green Top Inn.' I went back by the filling station. I looked down but I couldn't see anything. I went to the `Green Top Inn' and when I turned around at the `Green Top Inn,' Roy Kelly was driving behind me with his lights off and I stopped and he asked me didn't I hear all the shooting down there. I told him I did not. He said that after I left he backed his car up to the corner and he said he stepped out on the running board and saw an officer fall in the front of the filling station and he then drove off. . . . We drove to Ralph Hanford's home and there was a light in his room. We drove about two blocks and turned and came back and I parked in front of his home and went around to the back of the house and to his room. I could see through the window. Wade was talking to Ralph and I told them to come out and so Ralph had gone to bed. He finished putting his clothes on and came out. It must have been around 2:30 when I got to Hanford's or a quarter to three, just long enough to drive from there to the `Green Top Inn' and back then we drove to where Kelly's car was. Kelly was with me, the four of us together. I asked Roy what had happened and all, and he told me about the officers driving up in front. He said the officers drove up in front of the place and got out of the car and started to the door up in front of the place and Huffman told them to stop. Ralph was in the car with me when he was telling me this and Wade Hanford and Roy Kelly was in the car. He said that Huffman told the officers to stop and that they kept on walking and he said all at once all of them started shooting all at the same time. He *Page 642 
said he did not know who shot first and when they started shooting he laid down on the floor and Wade said he laid down near the safe. . . . Wade Hanford and Ralph Hanford were in my car. We turned off on a country road and Kelly got in the car with us, and we sat there talking. I guess this was a little after three. We were all four there talking. We were trying to decide what to do with Helen Holder. Wade said he was afraid she would talk and said he thought it would be a good thing to get rid of her. He said bump her off. I told him I didn't think that would be a good idea and Kelly said if he did he didn't know where to put her and he said he didn't think Helen would say anything and he would go get her and all of us could talk to her and we agreed to that. So he went over to the `Wagon Wheel' and got her and brought her where we were waiting and Ralph proceeded to tell her just what had happened up there and all five of us were together. Ralph said he did not shoot any. Wade said he shot three times. Ralph asked Wade what he did with the empty cartridges and Wade said he left them on the floor. Ralph told Helen what had happened at the filling station that night. I heard her testify and I have told what he said. We decided to split up at that time. . . . Wade asked me to carry him to Haw River. He said he would get Minnie Goodman to say he had been there all night. I took him to Haw River. Ralph stayed with me. Helen went with Kelly. After we carried Wade to Haw River, we went back to the `Correct Time Inn' and spent the night — the rest of the night. It was close to five o'clock when we got back there. I spent the night there. We left `Correct Time Inn' about eleven the next day, carried Myra home. She lives at Elon College and then we carried Mary home in Burlington, the place she had been staying. . . . I did not have a gun that night. Ralph did not have a gun. Wade had one, just one. I saw the gun. Roy Kelly had one, looked like a thirty-eight to me, revolver. The case of oil put in my car was in a paper carton. I left it in the woods. I never moved it from that place. I have seen that place since that time. After I was arrested Mr. Davis carried me there. The old case was there, but the oil was gone. Sergeant Davis was with me at the time. I pointed the place out to him as being the one." On cross-examination Smith admitted he was a married man and had one child, but had not lived with his wife for six years. That he came to Burlington to see Mary Fitts, a young girl who came from Roanoke Rapids. He was keeping her. He took her from one roadhouse to another and from one saloon to another. Did not know Roy Kelly or Ralph Hanford but entered into company with these parties. They drank four pints of whiskey from 12:00 that day to 12:00 that night. "I saw them when they went in the door the first time. I carried them down there in my car that I came from Roanoke Rapids in. *Page 643 
The front seat of my car was the one that was loosened. The seat was not taken out of the back, just a little pin that holds the seat steady was taken loose so it could be removed. They were intending to put the safe in it, Roy Huffman, Wade and Ralph Hanford. Kelly was not a party to that transaction at that time I don't guess. He was supposed to drive the car behind us after we put the safe on there. I don't see where I would have any more to do with it than the rest of them. They were intending to put the safe in my car, it is true. I guess I would have driven away from there with it. That is what I went down there to do. . . . Nobody made me go. They did not over-persuade me and they asked me to go there and the condition I was in I went. I had been drinking right much, all of them had been drinking, the whole crowd. The Hanford boys were drunk and I finally consented to go and use my car."
He served a road sentence for an assault on a man at a filling station and was given 18 months. He had been tried and served time for speeding and reckless driving, and six months for fighting. He knew Ralph Hanford and Wade Hanford when they were in Hillsboro Camp serving time. Was tried in Petersburg, Va., "same as they had Ralph for" and paid out; tried twice for whiskey and paid out; skipped a $250.00 bond in Virginia and another charge for whiskey. He testified further: "I said I didn't want to go to the place, we were all too drunk to go. I think something like that was said that I told them they were too drunk. . . . I did not decide that I would swear these other boys to death to save my own neck. I just decided to tell the truth regardless of what it cost. They have not promised me anything to plead guilty to murder in the second degree. They accepted it today, but did not tell me until today. I did not know that they would accept it until today. I did not know that at the psychological moment they would accept my plea and plead guilty to second degree murder. I am telling the truth. I had no promise that if I would swear against the Hanford boys they would let me plead guilty of murder in the second degree. I never heard of that. My attorney came to see me after I came back about a week after I got back to Graham. I have not talked to the solicitor or counsel at the solicitor's table. . . . My lawyer told me that they did not promise me anything. My lawyer said he was going to try to enter that plea, he didn't know whether they would accept it or not. Just a minute before he asked for it, he said he was going to ask for it and see if they would. When he got up and tendered the plea, I didn't know that they would accept it."
(3) Wade Hanford. Evidence, in part, against him. Testimony of George Smith that directly involved him in the robbing and killing. He made a voluntary confession to R. B. Christian. His whereabouts *Page 644 
the day before was testified to by Helen Holder, who also testified to the robbery and killing as related by Ralph Hanford in his presence when they all sat in the Pontiac automobile together.
(4) Ralph Hanford. Evidence, in part, against him. Testimony of George Smith that involved him in the robbery and killing. This testimony was corroborated by his sweetheart, Myra Buckner, as to his whereabouts the day before and just before and after the killing. Helen Holder as to the statement of Ralph Hanford in her presence as to what took place at the killing when they all sat in the Pontiac automobile together.
The jury convicted Roy Kelly, Wade Hanford and Ralph Hanford of murder in the first degree and each was sentenced to suffer death by the administration of lethal gas. The defendant George Smith was sentenced to a term of twenty-five (25) years in the State's Prison. The defendants made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and other necessary facts will be set forth in the opinion.
The alleged crime was committed in Alamance County, N.C. The court below ordered a special venire from Orange County, N.C. and defendants were tried and convicted by a jury of Orange County.
The first question involved, as presented by defendants: "(a) The judge's failure to charge as to the presumption of innocence; (b) to define the burden of proof and place it upon the State; (c) to give and explain the rule as to the credibility of the testimony of an accomplice; (d) and to instruct that failure to take the stand raises no presumption, and is not to be taken against the defendants."
The defendants were tried under the following statute in this State — N.C. Code, 1935 (Michie), sec. 4200: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree and shall be punished with imprisonment of not less than two or more than thirty years in the State Prison." The court below read this section to the jury and fully charged the jury as to its meaning. A homicide *Page 645 
committed in the perpetration of robbery is murder in the first degree. S.v. Lane, 166 N.C. 333; S. v. Donnell, 202 N.C. 782; S. v. Glover,208 N.C. 68.
In the charge is the following: "Now, gentlemen of the jury, the prisoners in this case, as are the defendants in any and every criminal case tried in our courts, are presumed to be innocent until their guilt has been established, and in order to establish the guilt, the burden is upon the State to satisfy the jury from all the evidence, beyond a reasonable doubt, that they are guilty. Reasonable doubt is a legal term and has a meaning. The law does not say that the defendant has to be convicted beyond a doubt. That does not mean a conjectural or fictitious doubt. It does not mean a doubt founded upon something that you might imagine, but it means a doubt founded upon some substantial reason growing out of the evidence itself which you have heard, so in order to convict these men or any of them, it will be necessary for you to be satisfied from all the evidence beyond a reasonable doubt that they are guilty."
The defendants reply on S. v. Hardy, 189 N.C. 799 (805). We do not think that their position can be sustained. In S. v. Jordan, ante, 356 (365-6), is the following: "An examination of the numerous propositions as to which the trial judge must give instruction, without special request, shows that the duty to so instruct has arisen in two ways: First, through the operation of C. S., 564, requiring a statement of the evidence and the application of the law thereto; and, second, through precedent establishing the duty because of its substantial importance to the rights of the defendant on trial. As to the proposition last stated, we find no precedent other than S. v. Hardy, supra, if it be a precedent; as to the first — and the defendant claims under the statute — it is difficult to see how the duty of such an instruction can be brought within the requirements of a statute which simply says that the trial judge `shall state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon.' A reference to the record and the briefs in the Hardy case, supra, discloses that the omission to instruct the jury that the failure of defendant to go on the stand was not to be taken to his prejudice is not brought up by the two exceptions taken to the judge's charge, nor was it adverted to in the briefs, and it was not, therefore, before the Court. It may be treated as a dictum. Treating the question raised, therefore, as a matter of first impression, it is debatable whether the judge does not do the defendant a disfavor by emphasizing the failure of the defendant to go upon the stand and, thereby, deepening an impression which is perhaps hardly ever removed by an instruction which requires a sort of mechanical control of thinking in the face of a strong natural inference. S. v. Bynum, supra (175 N.C. 777); S.v. Spivey, supra (198 N.C. 655). Upon these considerations, we think *Page 646 
the matter had best be left to the sound discretion of the defending attorney whether he shall forego the instruction or specially ask for it."
In S. v. Ashburn, 187 N.C. 717 (727), "The conviction of defendant was almost entirely on the unsupported testimony of Essie Hardy — from the entire record shown to be an accomplice." At p. 728 it is written: "InS. v. Miller, 97 N.C. 487, Davis, J., said: `It has been repeatedly laid down that a conviction on the testimony of an accomplice uncorroborated is legal, Roscoe's Criminal Evidence, 121; and this has been well settled as the law of this State, certainly since the cases of S. v. Haney,19 N.C. 390; S. v. Hardin, ibid., 407; and S. v. Holland, 83 N.C. 624. It is, however, almost the universal practice of the judges to instruct juries that they should be cautious in convicting upon the uncorroborated testimony of an accomplice, and Gaston, J., in S. v. Haney, supra, says: `The judge may caution them against reposing hasty confidence in the testimony of an accomplice. . . . Long usage, sanctioned by deliberate judicial approbation, has given to this ordinary caution a precision which makes it approach a rule of law.' If the unsupported testimony of the accomplice produce undoubting belief of the prisoner's guilt, the jury should convict.' S. v. Register, 133 N.C. 746; S. v. Shaft, 166 N.C. 407. The court below charged the law fully and cautioned the jury, `You may convict on the unsupported testimony of an accomplice, but "that it isdangerous and unsafe to do so."' `The charge was all, and perhaps more, than the defendant was entitled to.' " The matter was in the sound discretion of the court below. There was evidence to the effect that the accomplice's testimony was corroborated in every respect.
In S. v. Herring, 201 N.C. 543 (551), is the following: "The courts below ordinarily in the charge to the jury apply the `Presumption of innocence' in the interest of life and liberty, and enlarge on `reasonable doubt,' `fully satisfied' or `satisfied to a moral certainty.' S. v.Sigmon, 190 N.C. 627-8; S. v. Tucker, 190 N.C. 709; S. v. Walker, 193 N.C. at p. 491. When instructions are prayed as to `presumption of innocence' and to enlarge on `reasonable doubt' it is in the sound discretion of the court below to grant the prayer. The court below told the jury `my duty is to instruct you that it is your duty to not repose hasty confidence in the testimony of Chevis Herring. You must scrutinize the testimony of Chevis Herring carefully and cautiously,' etc. The court could have instructed the jury that the uncorroborated testimony of an accomplice, if believed by the jury beyond a reasonable doubt, is sufficient to convict, but the court below rightly gave the caution. This is in the sound discretion of the court. S. v. Ashburn, 187 N.C. at p. 728." *Page 647 
From the well settled authorities in this State, defendants' contentions cannot be sustained on any of their objections on this aspect.
The second question involved, as presented by defendants: "The judge's charge that it was unnecessary to find any previous purpose or plan in order to convict all of the defendants of first degree murder where the homicide was allegedly committed by one of them."
The court below charged on this aspect: "Now, gentlemen of the jury, I charge you that if you find from all the evidence, and beyond a reasonable doubt that these three defendants, or any of them, killed Sheriff Robertson by perpetrating or attempting to perpetrate robbery, that would make all three of them guilty, that is, if one actually did the shooting and the others were participating in the act of robbery. I charge you, gentlemen, that the law is this: When two or more persons aid and abet each other in the commission of a crime, all being present, all are principals and equally guilty. If you find that one of this party was committing this robbery and any of the other defendants were there present aiding and abetting and encouraging, then it would be immaterial which one actually fired the fatal shot. The man who was there aiding and abetting and participating in the robbery would be equally guilty with the man who fired the shot. . . . I charge you also that it makes no difference whether they intended to shoot the officers when they went there or not; whether it was the plan to shoot the officers is immaterial. Even though you find that they had no previous purpose and design and plan, still if they were there and perpetrated the robbery and the officer was killed in the perpetration or attempted perpetration of the robbery, that would make them all guilty regardless of who fired the shot and would make them all equally guilty and make them guilty of murder in the first degree, unless as I say you find from the evidence that they were in such drunken condition they didn't know and understand and realize what they were doing."
In S. v. Cloninger, 149 N.C. 567 (573), is the following: "John Cloninger and Charles Costner were aiders and abettors. There is abundant evidence to sustain a conviction where the bystander is a friend of the perpetrator, and knows that his presence will be regarded by the perpetrator as an encouragement and protection. Presence alone may be regarded as encouraging. S. v. Jarrell, 141 N.C. 725. To like effect isS. v. Finley, 118 N.C. 1161."
In S. v. Bell, 205 N.C. 225 (226-7), speaking to the subject, we find: "The case was tried upon the theory that if the defendants conspired to burglarize or to rob the home of George Dryman and a murder were committed by any one of the conspirators in the attempted perpetration of the burglary or robbery, each and all of the defendants would be guilty of the murder. This is a correct proposition of law. S. v. *Page 648 Donnell, 202 N.C. 782, 164 S.E. 362; S. v. Miller, 197 N.C. 445,149 S.E. 590. It is provided by C. S., 4200, that a murder `which shall be committed in the perpetration or attempt to perpetrate any . . . robbery, burglary or other felony, shall be deemed to be murder in the first degree.' "
In S. v. Ray, 212 N.C. 725 (731), it is stated: "The principle is well established that one who, being present, gives aid and comfort, counsel or encouragement to another, in the commission of a crime, is guilty as a principal. S. v. Cloninger, 149 N.C. 567; S. v. Hart, 186 N.C. 582; S.v. Dail, 191 N.C. 234; S. v. Gosnell, 208 N.C. 401."
In S. v. Epps, 213 N.C. 709 (713), it is said: "In S. v. Davenport,156 N.C. 596 (614), is the following: `A person aids and abets when he has "that kind of connection with the commission of a crime which, at common law, rendered the person guilty as a principal in the second degree. It consisted in being present at the time and place, and in doing some act to render aid to the actual perpetrator of the crime, though without taking a direct share in its commission." Black's Dict., p. 56, citing Blackstone, 34. An abettor is one who gives "aid and comfort," or who either commands, advises, instigates, or encourages another to commit a crime — a person who, by being present, by words or conduct, assists or incites another to commit the criminal act (Black's Dict., p. 6); or one "who so far participates in the commission of the offense as to be present for the purpose of assisting, if necessary, in such case he is liable as a principal,"'" citing numerous authorities.
Defendants' contentions cannot be sustained on this aspect.
The third question involved, as presented by defendants: "The judge's charge that defendants must affirmatively assume the burden of proving drunkenness and even if they did so to the satisfaction of the jury, proving lack of mental capacity to understand what they were doing, this would still make defendants guilty of murder in the second degree.
In S. v. Cloninger, supra, at p. 572, it is said: " `Transitory homicidal plea' as to Will Cloninger. The presumption is that he was sane. The burden was on him to show the contrary. S. v. Potts, 100 N.C. 465. Will Cloninger testified: `I guess I was unconscious. . . . I saw Mauney coming towards me, he said he was going to kill me, and I thought he was. I then struck him.' His Honor charged: `If the person at the time of the homicidal act was in a state of mind to comprehend his relation to others, or, knowing the criminal character of the act, was conscious that he was doing wrong, he was responsible; otherwise he was not, and such would be your verdict.' This charge follows S. v. Haywood, 61 N.C. 376, which has been approved since on this point. S. v. Potts, 100 N.C. 465; S. v.Davis, 109 N.C. 784; S. v. Branner, ante, 559, and in other cases." *Page 649 
It is a well settled rule that "the burden rests upon the defendant to prove the defense of drunkenness to the satisfaction of the jury to mitigate the offense." S. v. Hammonds, ante, 67 (78). And the charge that if the jury found that these defendants were so drunk that they did not know or realize what they were doing, they would not be guilty of murder in the first degree but would be guilty of murder in the second degree has been approved in effect by this Court in the case of S. v. Williams,189 N.C. 616-620. Here the Court approved the following charge in this regard: "`Drunkenness under the law is no excuse for crime and does not relieve the person of guilt for crime entirely. But in the case of murder, if a person is so intoxicated and rendered so insensible and so irrational by intoxication of any kind, or is naturally so weak-minded from natural causes that he cannot form an intent and cannot premediate and deliberate, then it reduces the offense from murder in the first degree to murder in the second degree.' "
The court below charged the jury: "The law presumes, gentlemen, that every man is sane and when a man comes into court and sets up a plea of drunkenness in order to excuse himself from some violation of the law, he must satisfy the jury from the evidence that he is not responsible by reason of the fact that he did not have mental capacity sufficient at the time to thoroughly know and understand what he was about and what he was doing."
Defendants object to the charge of the court with regard to the degree of proof necessary to be offered by them as to their mental capacity, to reduce the crime from murder in the first degree to murder in the second degree, and argues under these exceptions that the judge should have submitted to the jury the issue of manslaughter; and complains further that the court did not properly define murder in the first degree and murder in the second degree. The court defined murder in the first degree as follows: "Murder in the first degree not only is the unlawful, felonious, and malicious slaying of another, but a killing that has been done with premeditation and deliberation." And defined murder in the second degree as: "The unlawful and malicious killing of a human being. . . . The killing with malice, nothing else appearing, is murder in the second degree." The court further charged the jury as to murder in the second degree as follows: ". . . A killing with a deadly weapon, nothing else appearing, is at least murder in the second degree. It is not necessary to actually prove malice, if one kills another with a deadly weapon . . . the fact that a deadly weapon was used would make that murder in the second degree at least." And with regard to that portion of the charge complained of, "Unless you find from the evidence that the killing was entirely without malice," attention is called to that portion of the charge: "In order for a defendant to *Page 650 
reduce the crime from murder in the second degree, in order to show justifiable homicide, the burden would be upon the defendant to satisfy the jury, not by the greater weight of the evidence, nor beyond a reasonable doubt, but the burden would be upon the defendant to satisfy the jury that the killing was without malice before it could be reduced to any lower degree than murder in the second degree."
We think this charge covers the contention complained of by defendants. The court did not submit to the jury the issue of manslaughter, because there is no evidence in the record which would justify the submission of such an issue. The matter complained of is not prejudicial to the defendants.
Defendants' contentions cannot be sustained under this aspect.
The fourth question involved, as presented by defendants: "This contention relates to the remarks of the solicitor in his argument to the jury to the effect that certain of the State's evidence was `uncontradicted.'" The court on each occasion warned the jury not to consider such statements and ordered the solicitor in no uncertain terms not to continue such argument. Our Court has held that such an argument to the jury is free from error when the court has properly warned the jury not to consider the same. S. v. Weddington, 103 N.C. 364; S. v. Hooker,145 N.C. 581; S. v. Winner, 153 N.C. 603; S. v. Davenport, 156 N.C. 596. The language complained of in the case of S. v. Hooker, supra, at p. 584, almost the identical language was objected to. In this case the Court said: "The last exception is to the solicitor's comment that `none of the evidence as testified to by the State's witnesses has been contradicted and no one has said that it was not true.' This could not be taken as a criticism upon the failure of the defendant to put himself upon the stand."
Defendants' contentions cannot be sustained under this aspect.
The fifth question involved as presented by defendants: "The judge's numerous errors in permitting testimony impeaching the character of the defendants, when defendants had neither taken the stand nor directly placed their characters in issue." All these objections relate to questions and answers concerning Roy Huffman, one of the participants in the robbery and murder. Huffman was killed in the fight at the filling station when the officers arrived; he was not on trial and evidence as to the fact that he had been a former convict cannot be taken advantage of in the way of an objection by either of these defendants.
Other contentions are to the court's permitting the solicitor for the State to ask the witness if Roy Kelly had made a statement to him as to whether or not he was an escaped prisoner, and permitting the witness to also state that Roy Kelly had informed him at this time that he had escaped from prison with Roy Huffman. Both these statements were *Page 651 
made to the witness T. J. Davis, the officer to whom Roy Kelly made an oral confession, and were made at the time of the confession. These declarations of the defendant made to the officer during the course of his conversation with him and at the time of the confession were properly admitted.
In the case of S. v. Swink, 19 N.C. 9 (13), it was said: "It is undoubtedly law that in criminal as well as civil cases the whole of an admission or declaration made by a party is to be taken together," etc.
In the case of S. v. Edwards, 211 N.C. 555 (556), the Court, also speaking to this subject, says: "The defendant was entitled to have the confession considered as given in its entirety, with whatever views or theories it afforded," citing authorities.
In Burnett v. People, 204 Ill. 208, 68 A.S.R., 206, 66 L.R.A., 304, the following instruction was held to be a correct statement of the law: "`The court instructed the jury that where a confession of a prisoner charged with a crime is offered in evidence, the whole of the confession so offered and testified to must be taken together, as (well as) that part which makes in favor of the accused, as that part which makes against him, and if the part of the statement which is in favor of the defendant is not disproved by other testimony in the case and is not improbable or untrue, considered in connection with all the other testimony of the case, then that part of the statement is entitled to as much consideration from the jury as the parts which make against the defendant.'"
Notwithstanding the above, evidence of a former prison record, an escape from prison of the defendant is competent in this case. He had escaped from prison with Huffman, one of the parties to the crime who was killed in its commission, all his companions were ex-convicts and evidence that the defendant Kelly was an escaped prisoner and that he had escaped with Huffman, one of the perpetrators of the crime, is competent to show "quoanimo, intent, design, or guilty knowledge, where such requirements are so connected as to throw light upon the question." S. v. Godwin, ante, 49.
As said in S. v. Payne, 213 N.C. 719 (725): "We think the evidence of the occurrences in which the defendants made their escapes singular from the State Prison and subsequent evasions of arrest are competent as tending to show the state of mind of the defendants at the time of the killing of George Penn, at the end of a running gun battle in an attempt to escape arrest by him. In their confession the defendants separately admit that they knew that an officer was pursuing them and that they heard the siren on his automobile."
We have stated the facts and law at some length, as the matter is of such grave importance. After thorough consideration of the record and *Page 652 
able briefs of the Attorney-General and counsel for defendants, we see no prejudicial or reversible error in the record.
The court below tried the case with care and ability; applying the law applicable to the facts, in accordance with the decisions of this Court. The court quoted the evidence and set forth the contentions of the State and of defendants accurately and without bias.
By competent evidence introduced on the trial, it was shown that the defendants and Roy Huffman (who was killed) attempted to rob the Sprinkle Service Station of a safe and committed the robbery of some oil and anti-freeze. They were all ex-convicts and all aided and abetted the robbery and attempted robbery. The plan was agreed upon by all. Two automobiles were used for the purpose — a Pontiac and a Ford — one of which had the seat loosened so that the safe which they were to take from the service station could be placed in it. The two automobiles were nearby to help and protect the robbers — one to haul the safe in and the other to watch and block the road if the officers or anyone pursued them. They had burglary tools and nitro-glycerine, which was known to all the participants. Some oil and anti-freeze were taken from the service station and placed in the cars in waiting. The robbery was a bold one, as the place was well lighted, in Burlington near the underpass. The defendants had broken the lock and gone into the station. They had weapons — one a .45 automatic revolver, and the other a .32 Smith Wesson pistol. As they were forcing the door open they were seen by a young man employed by a dairy who was on his way to work. He reported the matter to the sheriff of the county and the sheriff and two police officers went to the scene. When they arrived men were on the inside of the service station. One of the officers fired into the service station and shot and killed one of the men (Roy Huffman). The sheriff and one of the police officers (Vaughn) were killed in the gun-battle. Twelve loaded .45 shells that had not been fired were taken from the pocket of Roy Huffman, who was killed in the station. There were five empty shells from the .45 pistol in the service station and four .32 cartridges that had not been fired. Roy Kelly did not go into the service station, but was in waiting in one of the cars outside. Wade Hanford had two .32 Smith Wesson pistols and Ralph Hanford had one of them on the night of the shooting. They and Huffman went into the service station. When Huffman was killed, Wade Hanford said he shot three times and came out of the service station with his hands up. Wade and Ralph Hanford went away from the station after the shooting and fled.
There were eight different bullet holes in the body of Sheriff Robertson. In Vaughn's body, the police officer who was killed, there were two holes and one in his finger. There were eleven shots in all in the two officers. *Page 653 
All the defendants, who were ex-convicts, had sweethearts or girl friends. The evidence was to the effect that they had all been drinking and staying in tourist cabins with their sweethearts or girl friends the day before. They stayed at "The Green Top Inn," "The Correct Time Inn," "The Wagon Wheel," etc. None of these parties were working. The evidence shows that this robbery and killing was committed by men who had criminal records. It was a bold crime, in almost the heart of the town, the men "armed to the teeth" and with burglary tools. The sheriff and Officer Vaughn were killed on the battlefield of duty and law enforcement. The evidence is plenary in every respect that the defendants were guilty of the killing of these two officers. The places they habitually frequented with their sweethearts and girl friends indicate were places of vice and dives which usually are breeding places for crime. They had all been drinking. The evidence shows that the perpetrators were criminals of desperate character, moved and instigated by the devil with hearts fatally bent on mischief.
For the reasons given, we find in the record no prejudicial or reversible error.
No error.